## AFFILIATED ENTERPRISES, Inc., v. ROCK–OLA MFG. CORPORATION.

District Court, N. D. Illinois, E. D.
April 23, 1937.

4

Jacobson, Merrick, Nierman & Silbert, of Chicago, Ill., for plaintiff.

C. E. Threedy, of Chicago, Ill., for defendant.

HOLLY, District Judge.

This is a suit in equity for an injunction and damages. Plaintiff, a Colorado corporation, is the proprietor and licensor of an advertising plan or system used extensively in various motion picture theaters throughout the country known as "Bank Night." The defendant, an Illinois cor-

poration, manufactures, sells, and leases various amusement devices and machines called pin-ball games.

The tangible implements of plaintiff's system consist of registration books, registration cards, record books, drawing cards, film trailers, and a variety of advertising matter and instructions. The plaintiff has secured a copyright for the various written materials it uses in promulgating its instructions and promoting the idea of its plan. It has also registered its trade-mark of the "Bank Night" system in the state of Illinois. In addition, it has applied for a patent to protect the purposes and working arrangement of its plan.

The bill of complaint alleges that the defendant has appropriated the name of "Big Bank Nite" on one of the pin-ball games which it manufactures and sells.

The plaintiff alleges that it is entitled to relief upon three grounds: First, that its copyright has been infringed; second, that there has been an infringement of its trade-mark; and, third, that the acts of the defendant constitute unfair competition and should, therefore, be enjoined.

The defendant has filed a motion to dismiss the plaintiff's bill of complaint, averring: (1) That the plan or system of which the plaintiff is the proprietor is a lottery and, therefore, unlawful; (2) that "there is no averment or allegation of facts in the bill of complaint that defendant has manufactured and sold or is engaged in the manufacture and selling" of articles similar to those manufactured and sold by the plaintiff; and (3) that the plaintiff has failed to establish a trade-mark use, in that trade-marks are applicable only to articles of traffic and must be actually affixed to some vendible commodity.

As stated in the complaint, the plaintiff's plan of "Bank Night" works in the following manner: Those theaters which wish to institute the system are granted a license by the plaintiff and supplied with all necessary material and instructions. The theater places on deposit in a well-known bank in the community a certain sum of money each week. It then advertises to the public that any one may freely register for an opportunity to be awarded a prize consisting of this money. A registration book is kept in the lobby of the particular theater or in some other convenient place in which the names and addresses of the public generally are recorded. These names are then transferred to an alphabetical record book bearing a separate number corresponding to each registration number. For each number in the record book there is a separate card containing an identical number. On the evening the "Bank Night" drawing takes place, the cards are placed in a large box or container on the stage of the theater. A disinterested person then draws out one of these cards. The number of the card is then checked with the corresponding number in the record book and the name of the person there found is announced both from the stage of the theater and outside the theater proper. If the person whose name is called appears and identifies himself he is awarded the prize. If the person so named does not appear within a reasonable time the amount of money to be awarded that week is added to the sum placed on deposit for the following week, an idea which the plaintiff calls a "build-up" plan. If, as may happen, the person whose name is called is outside the theater, he is permitted to enter and claim the prize without paying an admission fee or buying a ticket. The "Bank Night" plan of the plaintiff is free to the participants, who are members of the public generally. Any one may register his name without cost, and it is not a requirement of the plan that one should buy a ticket to the particular theater in order to be eligible to win the prize.

██ Does this scheme constitute a lottery as the defendant avers? The elements of a lottery are: (1) A prize; (2) chance; and (3) consideration. 17 R.C.L. 1222, 4 Words and Phrases, Third Series, p. 1005; Williams Furniture Co. v. McComb Chamber of Commerce, 147 Miss. 649, 112 So. 579, 57 A.L.R. 421, and note. A prize which is awarded by mere chance to any one who pays for the privilege of winning is a lottery within the meaning of the statutes relating to that subject. It is admitted that prize and chance, two of the elements, are present here; but the controversy between the parties is concerned with their varying interpretations of what does or does not constitute consideration. The defendant cites Society Theatre v. Seattle, 118 Wash. 258, 203 P. 21, 22. There it was held that a prize offered to patrons of a theater was a lottery, and, therefore, illegal. In that case, however, it is to be noted that a municipal ordinance governed the interpretation of a lottery. The court stated in its opinion that: "This ordinance is broad. It gives its own definition of a lottery, which

is probably somewhat wider than the usual definition given by the dictionaries." But even in absence of the ordinance itself the plan in question in the Seattle Case involved the purchase of tickets by those who wished to participate in awarding of the prize. The authorities are agreed that the consideration necessary in these cases may be either direct or indirect. 38 C.J. 292. The purchase of a ticket is sufficient consideration to bring such a plan within definitions of a lottery scheme or gift enterprise. For example, it has been held in Featherstone v. Independent Service Station Association of Texas, Tex.Civ. App., 10 S.W.2d 124, that tickets for a chance to win an automobile, when given with every dollar's worth of merchandise purchased, constituted a lottery scheme, but if the tickets were given free there could be no objection to the plan.

The defendant argues that the theater benefits by increased patronage because of the bank night plan, and, therefore, the necessary element of consideration is present. In People v. Cardas, 137 Cal.App., Supp., 788, 28 P.2d 99, the court was confronted with a theater advertising plan which involved the giving of free tickets for a trip to Catalina Island. The holders of these tickets could be in or out of the theater and the tickets themselves were distributed without charge. The court held that this was not a lottery. At page 100 of 28 P.2d it is said: "The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office, but from another employe, could not be said to have paid a consideration for the prize tickets since they could have received them free."

The general purpose of the lottery statutes is to prevent members of the public from being cheated and defrauded of their money in return for a mere chance to receive something which may or may not be of greater value than the sum which they have invested. This is ably illustrated in Post Publishing Company v. Murray, 1 Cir., 230 F. 773. In that case a newspaper advertised that its photographers would take pictures of fifty women shoppers which would be published in the newspaper with the heads cut off. Each woman who could identify her picture would be awarded a prize of $5. The newspaper asked to be relieved from an order of the Boston Postmaster banning the paper from the mails, under authority of section 213 of the Criminal Code of the United States, 18 U.S.C.A. § 336. The District Court denied relief. The judgment was reversed upon appeal. At pages 775 and 776, the court stated: "It seems to us quite impossible, under the rule of strict and literal construction of the statute, to accept the advertisement in question as one containing the elements of wrong involved in the schemes against which the statute was directed. The advertisement, or scheme, in question does not seem to be like any of the kinds or types of wrong against which the act of Congress was directed. It did not present a lottery scheme, because a lottery involves a scheme for raising money by selling chances to share in distribution of prizes—a scheme for the distribution of prizes by chance among persons purchasing tickets. It was not a gift enterprise, because a gift enterprise contemplates a scheme in which publishers or sellers give presents as an inducement to members of the public to part with their money. Nor did it present the kind of lot or chance which the act of Congress was striking against, because the particular kind of chance involved in the advertisement in question did not require a parting with anything by members of the public for the prize offered. * * * Thus the conclusion must be that there was no special intent to cheat or induce members of the public into buying something, or paying something for a chance. Instead of being that, it was a situation in which there was a general intent and general purpose to present something which the publisher thought would be attractive, and which would catch the eye and increase the circulation of the paper. We view this curious conception more as a playful one, though slightly sportive, and as one possibly involving the idea of burlesquing a little the street costume of women, thereby attracting public attention, with a view of increasing the circulation of the publication, rather than as a deliberate scheme to wrong members of the public."

The court felt that the mere fact that the circulation of the newspaper would be

increased by their novel advertising idea was not a sufficient consideration to make that idea an unlawful one.

The very plan now under consideration by this court has several times been held not to be a lottery or illegal in any sense. State v. Hundling, 220 Iowa 1369, 264 N. W. 608, 609, 103 A.L.R. 861, People v. Shafer, 160 Misc. 174, 289 N.Y.S. 649, and State v. Eames, 87 N.H. 477, 183 A. 590. And in Commonwealth v. Wall, Mass., 3 N.E.2d 28, 30, the jury found that bank night as operated by that particular theater was unlawful. · But upon appeal the higher court held that it had been error to instruct the jury that any form of technical consideration, " 'whether registration of the name or anything else' would be a sufficient price." The court stated that: "We are also of opinion that the price must come from participants in the game in part at least as payments for their chances and that the indirect advantage to the theatre of larger attendance is not in itself a price paid by participants."

█ It would seem, then, that the bank night enterprise of the plaintiff's, requiring the payment of no valuable consideration from members of the public, but rather enabling them to participate freely and without obligation, is not a scheme which could be held a lottery within the meaning of the prohibitory statutes relating to that subject, and that the defendant's motion to dismiss should not be granted on that ground.

█ In the second paragraph of the defendant's motion to dismiss, it is recited that: "There is no averment or allegation of fact in the bill of complaint that the defendant has manufactured or sold or is engaged in the manufacture or selling of books, pamphlets, films, tickets, cards and advertisement for promoting business for theatres." The defendant then concludes that there is, therefore, no cause of action for infringement of any trade-mark rights of the plaintiff. This is evidently merely another way of stating that the goods manufactured by the defendant are not of the same class as those produced by the plaintiff. The Supreme Court of the United States has said: "The mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of the same trade-mark by others on articles of a different description. There is no property in a trade-mark apart from the business or trade in connection with which it is employed. United Drug Co. ·v. Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. ·48, 63 L.Ed. 141; Hanover Milling Co. v. Metcalf, 240 U.S. 403, 413, 414, 36 S.Ct. 357, 60 L.Ed. 713." American Foundaries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317.

The plaintiff points to federal Equity Rules No. 25 and No. 29, 28 U.S.C.A. following section 723. Neither are material to the present question. Rule 25 does not more than set forth the formal requirements of a bill in·equity. 28 U.S.C.A. p. 87 notes. Rule 29 abolishes demurrers and provides that motions to dismiss shall be used instead. 28 U.S.C.A. p. 171, note 371 et seq.

The numerous cases cited by the plaintiff in this part of its brief (pp. 17–24) are merely quotations from the dicta of various courts in stating the general proposition that, upon a motion to dismiss, every reasonable doubt should be resolved in favor of the bill's sufficiency. The decisions dealing with trade-mark infringement and unfair trade are inapplicable here, because the very question to be decided in this case is whether or not such infringement or unfair practices exist. The plaintiff presupposes that they do. In the cases it cites, the courts found such situations actually present. It is beyond dispute that if the plaintiff has alleged a state of. facts showing infringement or unfair competition, it is entitled to relief.

█ Certainly, the plaintiff could not contend that the pin-ball games manufactured by the defendant constitute the same kind of merchandise or are articles of commerce similar to the promotional advertising scheme of its "Bank Night" system. But the plaintiff has alleged in its bill of complaint a cause of action predicated upon the ground of unfair competition. Thus, even if no technical trade-mark infringement is provable here, the plaintiff would still be entitled to injunctive relief for any improper or unfair use of the name it has utilized in designating its business.

█ There is a close connection between trade-marks and trade-names; but there is, nevertheless, a distinction between the two. Speaking broadly, a trade-mark is used in connection with a particular article of commerce while a trade-name is used in relation to a business, and is an insignia and symbol of its reputation and good will. In American Foundaries v. Robertson, 269 U.S. 372, at page 380, 46 S.Ct. 160, 162,

70 L.Ed. 317, the court stated that, " 'the law of trade-marks is but a part of the broader law of unfair competition,' the general purpose of which is to prevent one person from passing off his goods or his business as the goods or business of another. Whether the name of a corporation is to be regarded as a trade-mark, a trade-name, or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference, more or less recognized, which is that, generally speaking, the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will."

■ The purposes upon which the law of unfair trade is founded have been stated to be: "First, to protect the honest trader in the business which fairly belongs to him; second, to punish the dishonest trader, who is taking his competitor's business away by unfair means; third, to protect the public from deception." Atlas Manufacturing Co. v. Street & Smith, 8 Cir., 204 F. 398, 405, 47 L.R.A.,N.S., 1002.

A composite view of the various grounds for this type of action, as given by a number of authors and authorities, is that the court acts to promote honesty and fair dealing on the theory that no one has the right to sell his goods as the goods of another.

It has been stated as a general rule that there can be no cause of action for unfair competition where no competition between the parties exists. This view, however, has been slowly undergoing a marked change. The grounds for relief offered to the harassed man of business in cases of unfair trade practices is slowly outgrowing the strict definition followed by the earlier courts and writers. As one author has aptly expressed, "The emphasis is on the unfairness rather than on the competition." E. C. Lukens, 75 Pa.L.R. 197. Thus, in the famous case of Vogue Co. v. Thompson-Hudson Co. et al, 6 Cir., 300 F. 509, it was held that the manufacturer of women's hats could not use the word Vogue as indicated by the distinctive letter "V" when the same distinctive letter was used as an emblem in the name of the Vogue magazine. Here clearly there was no competition between the contesting parties. Women's hats are not of the same general merchandise as a regularly-published magazine. But the magazine in this case had held itself out for many years as an arbiter of women's style in dress, which included style fashions in millinery as well. The court recognized the fact that while these two articles of commerce were totally dissimilar the plaintiff might nevertheless be injured by the implication that it indorsed or approved the hats of the defendant. Should these hats be unstylish or of poor material, the plaintiff might find that innumerable of its subscribers would loose faith in it as a fashion authority and thereby lose a good part of its circulation.

Again, in Wall v. Rolls-Royce of America, Inc., 3 Cir., 4 F.2d 333, it was held that the manufacturer of radio tubes who placed upon them the name "Rolls Royce" and failed to indicate the place of origin or manufacture of the tubes would be enjoined from so using the name. In that case the court found it necessary to resort to the far-fetched analogy that electricity is an integral element in the use of both radio tubes and automobiles, and thereby found a similarity between the two products. Obviously, the implicit foundation of the decision was based upon the idea of injury to the plaintiff. Members of the public would become confused, not in the sense that by buying a radio tube they would be misled into thinking they had bought a Rolls Royce automobile, but rather in the idea that the name Rolls Royce appearing on the radio tubes naturally carried with it the implication that the automobile concern had some connection with their manufacture. Should these tubes prove of poor quality and unsatisfactory, the reputation of the plaintiff would be injured and its good will decreased.

In the same way injunctions have been granted in cases of beer and malt syrup, Anheuser-Busch v. Budweiser Malt Products Corporation, D. C., 287 F. 243; toilet soap and shaving soap, Waltke & Co. v. Schafer & Co., 49 App.D.C. 254, 263 F. 650; automobile and tires, Willys-Overland Co. v. Akron-Overland Tire Co., D. C., 268 F. 151; and men's suits and men's hats and caps, Rosenburg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962.

■ In this day of expanding business activity, where a manufacturer of munitions controls and produces motor cars and muslin as well, where large corporations produce and sell a variety of unrelated products upon which they often place a single trade-mark, it would be obviously unjust and ineffective to adhere to the old doctrine that unfair trade practices can

only be enjoined in cases where actual competition exists between the parties.

■ But there must be some connection between the products in question before equity will grant its aid. Does such a connection exist between the business of the plaintiff and that of the defendant in this case? Under any view of the facts here, it is hard to see how the court could hold that the defendant has been guilty of dishonest and unfair dealing in selling his goods as the goods of the plaintiff, that the public has been deceived, that the rights and property of the plaintiff have been violated, or that the defendant's course of conduct has resulted in unjust enrichment.

Even in the most liberal decisions such as the Vogue Case or the Rolls-Royce Case there has been a definite, if not similar, relationship between the articles. Here, not even such a relationship exists. The plaintiff and the defendant both cater to the field of amusement. But that field is a large one. If the plaintiff were entitled to restrain the defendant in this case, why could he not also claim protection against the use of its name as against a manufacturer of radios, or talking machines, or phonographs. Those, too, are amusement devices. In short, it strikes one that the protection to be afforded under the doctrine of unfair competition is not meant to meet a situation such as the one at bar, for the simple reason that there is no real need for protection here. The relationship between the parties and their activities appear too remote, and in no place does the plaintiff allege a specific instance of damage to it other than its general charge of deception to the public.

■ One more point remains to be considered. The plaintiff has alleged that the defendant has infringed its copyright by using the name Bank Night. The authorities are uniform in holding that a copyright does not carry with it the exclusive privilege of using the title by which the copyrighted material is known. Thus in Atlas Manufacturing Co. et al. v. Street & Smith, 8 Cir., 204 F. 398, 401, 47 L.R.A., N.S., 1002, the plaintiffs published a weekly detective story entitled Nick Carter. The defendant produced a movie in which they used the title "Nick Carter, The Great American Detective, Solving the $100,000.00 Jewel Mystery." Neither the title, the plot, nor the situation were similar to any story published by the plaintiff, whose stories had not been copyrighted, but were protected by a trade-mark. Action was brought for injunction and trade-mark infringement. At pages 402 and 403, of 204 F. the court said: "They [the stories] are subjects of copyright. And this leads us to inquire what complainants' standing would be under the law of copyrights. * * *

" 'Neither the author nor proprietor of a literary work has any property in its name. It is a term of description, which serves to identify the work; but any other person can, with impunity, adopt it and apply it to any other book or to any trade commodity, provided he does not use it as a false token to induce the public to believe that the thing to which it is applied is the identical thing which it originally designated. If literary property could be protected under the theory that the name by which it is christened is equivalent to a trade-mark, there would be no necessity for copyright laws.' Black v. Ehrich (C.C.) 44 F. 793.

"So the copyright of a book does not prevent others from taking the same title for another book, though the copyright has not expired."

And in Glaser v. St. Elmo Co., Inc., et. al., C.C., 175 F. 276, 278, the court said: "I think that the authorities, particularly the American cases, preponderate that the copyright of a book does not prevent other persons from taking the same title for another book, even in the case of an entirely unexpired copyright." The same rule has been followed in Patten v. Superior Talking Pictures, Inc., D.C., 8 F.Supp. 196, and Warner Bros. Pictures, Inc., v. Majestic Pictures Corporation et al., 2 Cir., 70 F.2d 310; both cases being so decided in 1934.

■ The only possible theory on which plaintiff could claim that its copyright had been infringed would be in the use of the title of the bank night instructions and other materials. The copyright it has secured protects the literary property to be found in this written material, but it does not protect the name Bank Night alone. It has not alleged, and there seems to be no reason for alleging, that the defendant has used other than the mere title on its pin-ball games. The copyright laws do not protect it from such use.

The motion to dismiss the complaint must be sustained. An order will be entered accordingly on April 23, 1937.