# FEDERAL COMMUNICATIONS COMMISSION *v.* AMERICAN BROADCASTING CO., INC.

NO. 117.

Argued February 1, 1954.—Decided April 5, 1954.

*J. Roger Wollenberg* argued the cause for appellant. With him on the brief was *Daniel R. Ohlbaum.*

*Alfred McCormack* argued the cause for appellee in No. 117. With him on the brief was *George B. Turner.*

*Paul W. Williams* argued the cause for appellee in No. 118. With him on the brief were *Thomas E. Ervin* and *Dudley B. Tenney.*

*Max Freund* argued the cause for appellee in No. 119. With him on the brief was *Ralph F. Colin.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases are before us on direct appeal from the decision of a three-judge District Court in the Southern District of New York, enjoining the Federal Communications Commission from enforcing certain provisions in its rules relating to the broadcasting of so-called "giveaway" programs. The question presented is whether the enjoined provisions correctly interpret § 1304 of the United States Criminal Code, formerly § 316 of the Communications Act of 1934. This statute prohibits the broadcasting of ". . . any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance . . . ."[1]

The appellees are national radio and television broadcasting companies. They are, in addition, the operators

---

[1] 18 U. S. C. § 1304 (derived from former § 316 of the Communications Act of 1934, 48 Stat. 1088–1089, repealed by 62 Stat. 862, 866):

"Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by

of radio and television stations licensed by the Commission. Each of the appellees broadcasts, over its own and affiliated stations, certain programs popularly known as "give-away" programs. Generally characteristic of this type of program is the distribution of prizes to home listeners, selected wholly or in part on the basis of chance, as an award for correctly solving a given problem or answering a question.[2]

The rules challenged in this proceeding, §§ 3.192, 3.292, and 3.656 of the Commission's Rules and Regulations,

---

means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"Each day's broadcasting shall constitute a separate offense."

[2] Examples of the "give-away" programs involved here are "Stop the Music" (American Broadcasting Company), "What's My Name" (National Broadcasting Company), and "Sing It Again" (Columbia Broadcasting System).

"Stop the Music" is described in American's complaint in No. 117 as follows: The home contestants are called on the telephone during the program. On the radio version, home contestants are selected at random from telephone directories. On the television version, home contestants are selected by lot from among those listeners who express in advance, through postcards sent to the network, their desire to participate. On both the radio and television versions, however, the home contestant is not required to be listening to the broadcast at the time he is called in order to participate. When called, the home contestant is asked to give the title of a musical selection that has just been played. In the event he was not listening, or for some other reason desires to have the tune repeated, the master of ceremonies hums or sings it to him over the telephone. If he answers correctly, he receives a merchandise prize; if not, he gets a less valuable "consolation" prize and a member of the studio audience is then given an opportunity to win the merchandise prize by identifying the same tune. If the home contestant answers correctly, he receives, in addition to the merchandise prize, an opportunity to identify another tune, called the "Mystery Melody." If he identifies this tune, he wins the "jackpot" prize, usually valued at several thousand dollars. Should he fail to identify the "Mystery Melody," another home contestant is called and the process is repeated. Addi-

were designed to prevent the broadcast of such programs.[3] The rules are identically worded and apply, respectively, to standard radio broadcasting (AM), FM radio broad-

tions to the "jackpot" prize are made each week so long as the "Mystery Melody" remains unidentified.

"What's My Name" is described in National's complaint in No. 118 as follows: Prizes are awarded to contestants for correctly identifying famous persons on the basis of clues given by the master of ceremonies and in a short skit performed by professional actors. All but one of the contestants on the program are chosen from members of the studio audience. The remaining contestant is chosen at random from postcards sent in by listeners, and is called on the telephone during the program. For answering the telephone, he is awarded a watchband manufactured by the sponsor of the program and is also given the opportunity to win a valuable "jackpot" prize in Government bonds by identifying the famous person described in the "jackpot" clues. If the home contestant fails to make a correct identification, the amount of the "jackpot" is added to the "jackpot" for the following week's program. The subject of the "jackpot" clues, however, is changed every week.

"Sing It Again" is described in Columbia's complaint in No. 119 as follows: Performers sing a popular song and then repeat it but this time with parody lyrics describing some person, place, or event. Contestants, selected at random from telephone directories, are called by long distance telephone during the program. If the contestant correctly identifies the subject described by the parody lyrics, he wins a merchandise prize and an opportunity to win a "jackpot" prize by identifying the "Phantom Voice," the voice of a famous but unrevealed person. Clues as to the identity of the "Phantom Voice" are given on the program and on other programs broadcast over the same network. The "jackpot" is increased week by week until the correct identification is made. If the home contestant fails to identify the subject of the parody lyrics, he receives a "consolation prize," and a member of the studio audience is given the opportunity to answer and win the merchandise prize.

[3] 47 CFR, 1952 Cum. Supp., §§ 3.192, 3.292, 3.656. The language of the rules is broad enough to cover contest programs drawing contestants solely from members of the studio audience. In the court below, however, the Commission took the position that such coverage was not intended, and the controversy was delimited to programs involving the distribution of prizes to contestants participating from their homes. 110 F. Supp. 374, 381.

casting, and television broadcasting.  Paragraph (a) of each rule provides that "An application for construction permit, license, renewal of license, or any other authorization for the operation of a broadcast station, will not be granted where the applicant proposes to follow or continue to follow a policy or practice of broadcasting . . . ," programs of a sort forbidden by § 1304.  Paragraph (b) provides that a program will fall within the ban

". . . if in connection with such program a prize consisting of money or thing of value is awarded to any person whose selection is dependent in whole or in part upon lot or chance, if as a condition of winning or competing for such prize:

"(1) Such winner or winners are required to furnish any money or thing of value or are required to have in their possession any product sold, manufactured, furnished or distributed by a sponsor of a program broadcast on the station in question; or

"(2) Such winner or winners are required to be listening to or viewing the program in question on a radio or television receiver; or

"(3) Such winner or winners are required to answer correctly a question, the answer to which is given on a program broadcast over the station in question or where aid to answering the question correctly is given on a program broadcast over the station in question.  For the purposes of this provision the broadcasting of the question to be answered over the radio station on a previous program will be considered as an aid in answering the question correctly; or

"(4) Such winner or winners are required to answer the phone in a prescribed manner or with a prescribed phrase, or are required to write a letter in a prescribed manner or containing a prescribed phrase, if the prescribed manner of answering the

phone or writing the letter or the prescribed phrase to be used over the phone or in the letter (or an aid in ascertaining the prescribed phrase or the prescribed manner of answering the phone or writing the letter) is, or has been, broadcast over the station in question."

After promulgation of the rules, the present actions were brought by the appellees.[4] The District Court sustained the Commission's general authority to adopt such rules, and sustained subdivision (1) of paragraph (b) as a correct interpretation of § 1304. But, with one dissent, the court held that subdivisions (2), (3), and (4) were beyond the scope of § 1304 and hence invalid. The court was of the view that § 1304 applied only to contest programs requiring contestants to contribute a "price" or "thing of value."[5] We noted probable jurisdiction and consolidated the cases for argument.[6]

Like the court below, we have no doubt that the Commission, concurrently with the Department of Justice, has power to enforce § 1304. Indeed, the Commission would be remiss in its duties if it failed, in the exercise of its licensing authority, to aid in implementing the statute, either by general rule or by individual decisions.[7]

---

[4] The actions were brought under § 402 (a) of the Communications Act of 1934, 48 Stat. 1093, 47 U. S. C. § 402 (a); 28 U. S. C. §§ 1336, 1398, 2284, 2321–2325; and § 10 of the Administrative Procedure Act, 60 Stat. 243, 5 U. S. C. § 1009. Pub. L. No. 901, 81st Cong., 2d Sess., 64 Stat. 1129, 5 U. S. C. § 1031, has since changed the procedure under § 402 (a), but is inapplicable to actions commenced prior to its enactment.

[5] 110 F. Supp. 374.

[6] 346 U. S. 808.

[7] The Commission is authorized by § 4 (i) of the Communications Act to "make such rules and regulations, and issue such orders, . . . as may be necessary in the execution of its functions"; by § 303 (r) to "Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to

But the Commission's power in this respect is limited by the scope of the statute. Unless the "give-away" programs involved here are illegal under § 1304, the Commission cannot employ the statute to make them so by agency action. Thus, reduced to its simplest terms, the issue before us is whether this type of program constitutes a "lottery, gift enterprise, or similar scheme" proscribed by § 1304.

All the parties agree that there are three essential elements of a "lottery, gift enterprise, or similar scheme": (1) the distribution of prizes; (2) according to chance; (3) for a consideration.[8] They also agree that prizes on the programs under review are distributed according to

carry out the provisions of this chapter"; by § 307 (a) and § 309 (a) to grant station licenses and license renewals "if public convenience, interest, or necessity" would thereby be served; by § 312 (a) to revoke a license for a violation of any regulation authorized by the Act. 48 Stat. 1068, 47 U. S. C. § 154 (i); 50 Stat. 191, 47 U. S. C. § 303 (r); 48 Stat. 1083, 47 U. S. C. § 307 (a); 48 Stat. 1085, 47 U. S. C. § 309 (a); 48 Stat. 1086–1087, 47 U. S. C. § 312 (a). The "public interest, convenience, or necessity" standard for the issuance of licenses would seem to imply a requirement that the applicant be law-abiding. In any event, the standard is sufficiently broad to permit the Commission to consider the applicant's past or proposed violation of a federal criminal statute especially designed to bar certain conduct by operators of radio and television stations. And if this consideration is a proper one in individual cases, there is no reason why it may not be stated in advance by the Commission in interpretative regulations defining the prohibited conduct with greater clarity. See *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 222–224; cf. *Southern Steamship Co.* v. *National Labor Relations Board,* 316 U. S. 31, 46–47.

[8] A typical "lottery" is a scheme in which tickets are sold and prizes are awarded among the ticket holders by lot. See *Stone* v. *Mississippi,* 101 U. S. 814. A typical "gift enterprise" differs from this in that it involves the purchase of merchandise or other property; the purchaser receives, in addition to the merchandise or other property, a "free" chance in a drawing. See *Horner* v. *United States,* 147 U. S. 449. But whatever may be the factual differences between

chance, but they fall out on the question of whether the home contestant furnishes the necessary consideration.

The Commission contends that there is such consideration; in its brief, it urges that these programs

". . . are nothing but age old lotteries in a slightly new form. The new form results from the fact that the schemes here are illicit appendages to legitimate advertising. The classic lottery looked to advance cash payments by the participants as the source of profit; the radio give-away looks to the equally material benefits to stations and advertisers from an increased radio audience to be exposed to advertising."

It contends that consideration in the form of money or a thing of value is not essential, and that a commercial benefit to the promoter satisfies the consideration requirement:

". . . Where a scheme of chance is successfully designed to reap profits for its promoter, there will ultimately be consideration flowing from the participants, and it is of no consequence whether such consideration be direct or indirect. In either event, the gambling spirit—the lure of obtaining something for nothing or almost nothing—is exploited for the benefit of the promoter of the scheme."

As against this claim the appellees insist that something more is required than just a benefit to the promoter; that the participation of the home audience by merely listening to a broadcast does not constitute the necessary consideration.

Section 1304 itself does not define the type of consideration needed for a "lottery, gift enterprise, or similar

---

a "lottery," a "gift enterprise," and a "similar scheme," the traditional tests of chance, prize, and consideration are applicable to each. We are aware of no decision, federal or state, which has distinguished among them on the basis of their legal elements.

scheme." Nor do the postal lottery statutes from which this language was taken.[9] The legislative history of § 1304 and the postal statutes is similarly unilluminating.[10] For guidance, therefore, we must look primarily to American decisions, both judicial and administrative, construing comparable antilottery legislation.

Enforcing such legislation has long been a difficult task. Law enforcement officers, federal and state, have been plagued with as many types of lotteries as the seemingly inexhaustible ingenuity of their promoters could devise in their efforts to circumvent the law. When their schemes reached the courts, the decision, of necessity,

---

[9] Section 1304 is one of five sections—§ 1301 through § 1305—which constitute "Chapter 61—Lotteries" of Title 18. Section 1305, added in 1950, exempts certain "fishing contests" from the operation of the other four sections. Section 1301 prohibits the importing or transporting of lottery tickets; § 1302, the mailing of lottery tickets and related matter; § 1303, the participation in lottery schemes by postmasters and postal employees; and § 1304, the broadcasting of lottery information. These four sections use the same terminology— "any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance." This language first appeared in the 1909 amendments to the federal lottery laws. 35 Stat. 1129, 1130, 1136. It was adopted verbatim in § 316 of the Communications Act of 1934, which was the first federal statute to ban the broadcasting of lotteries. With only slight modifications not material here, § 316 became § 1304 of the Criminal Code in the 1948 revision of Title 18.

For the early history of lotteries in this country, see Spofford, Lotteries in American History, at p. 171 of 1892 Report of American Historical Association, S. Misc. Doc. No. 57, 52d Cong., 2d Sess.

[10] See S. Rep. No. 1620, 80th Cong., 2d Sess. (1948); H. R. Rep. No. 304, 80th Cong., 1st Sess., p. A99 (1947); S. Rep. No. 781, 73d Cong., 2d Sess., p. 8 (1934); H. R. Rep. No. 1850, 73d Cong., 2d Sess. (1934); H. R. Rep. No. 1918, 73d Cong., 2d Sess., p. 49 (1934); S. Rep. No. 564, 72d Cong., 1st Sess., p. 10 (1932); H. R. Rep. No. 221, 72d Cong., 1st Sess., p. 8 (1932); S. Rep. No. 10, Part 1, 60th Cong., 1st Sess., p. 23 (1908); H. R. Rep. No. 2, Part 1, 60th Cong., 1st Sess., p. 22 (1908).

usually turned on whether the scheme, on its own peculiar facts, constituted a lottery. So varied have been the techniques used by promoters to conceal the joint factors of prize, chance, and consideration, and so clever have they been in applying these techniques to feigned as well as legitimate business activities, that it has often been difficult to apply the decision of one case to the facts of another.

And so it is here. We find no decisions precisely in point on the facts of the cases before us. The courts have defined consideration in various ways, but so far as we are aware none has ever held that a contestant's listening at home to a radio or television program satisfies the consideration requirement.[11] Some courts—with vigorous protest from others—have held that the requirement is satisfied by a "raffle" scheme giving free chances to persons who go to a store to register in order to participate in the drawing of a prize,[12] and similarly by a "bank night" scheme giving free chances to persons who

---

[11] In the only previous decision on the legality of a "give-away" program of the type involved here, a state trial court held that the program did not constitute a lottery because the consideration element was lacking. *Clef, Inc.* v. *Peoria Broadcasting Co.*, Equity No. 21368, Circuit Court of Peoria County, Illinois (1939).

Similarly, cases under the postal lottery laws (see note 9, *supra*) appear to be uniform in requiring a "valuable" consideration for a "lottery, gift enterprise, or similar scheme." See *Garden City Chamber of Commerce, Inc.* v. *Wagner*, 100 F. Supp. 769 (E. D. N. Y.), stay denied, 192 F. 2d 240 (C. A. 2d Cir.); *Post Publishing Co.* v. *Murray*, 230 F. 773 (C. A. 1st Cir.), cert. denied, 241 U. S. 675. But cf. dictum in *Brooklyn Daily Eagle* v. *Voorhies*, 181 F. 579, 581–582 (C. C. E. D. N. Y.).

[12] A leading case is *Maughs* v. *Porter*, 157 Va. 415, 161 S. E. 242; see also *State ex rel. Regez* v. *Blumer*, 236 Wis. 129, 294 N. W. 491. Contra, *Cross* v. *People*, 18 Colo. 321, 32 P. 821; cf. *Garden City Chamber of Commerce, Inc.* v. *Wagner*, 100 F. Supp. 769 (E. D. N. Y.), stay denied, 192 F. 2d 240 (C. A. 2d Cir.). For critical com-

gather in front of a motion picture theatre in order to participate in a drawing held for the primary benefit of the paid patrons of the theatre.[13] But such cases differ substantially from the cases before us. To be eligible for a prize on the "give-away" programs involved here, not a single home contestant is required to purchase anything or pay an admission price or leave his home to visit the promoter's place of business; the only effort required for participation is listening.[14]

We believe that it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime. Particularly is this true when through the years the Post Office Department and the Department of Justice have consistently given the words "lottery, gift enterprise, or similar scheme" a contrary administrative interpretation. Thus the Solicitor of the Post Office Department has repeatedly ruled that the postal lottery laws do not preclude the mailing of circulars advertising the type of "give-away" program here under attack.[15] Similarly, the Attorney General—

---

mentary on the *Maughs* decision, *supra*, see Notes, 18 Va. L. Rev. 465 and 80 U. of Pa. L. Rev. 744; Pickett, Contests and the Lottery Laws, 45 Harv. L. Rev. 1196, 1206.

[13] *E. g., Affiliated Enterprises, Inc.* v. *Waller*, 40 Del. 28, 5 A. 2d 257; *Affiliated Enterprises, Inc.* v. *Gantz*, 86 F. 2d 597 (C. A. 10th Cir.). Contra, *e. g., Darlington Theatres, Inc.* v. *Coker*, 190 S. C. 282, 2 S. E. 2d 782; *Affiliated Enterprises, Inc.* v. *Rock-Ola Mfg. Corp.*, 23 F. Supp. 3 (N. D. Ill.).

[14] Some of the programs involved here (*e. g.*, "Stop the Music," described in note 2, *supra*) do not even make this requirement. As a practical matter, however, few home contestants on a "give-away" program would be in a position to answer correctly the questions asked of them unless they listened to the program.

[15] In 1949 the Solicitor ruled that material relating to "Stop the Music" (described in note 2, *supra*) would be mailable. In 1950 he ruled that material relating to a comparable contest conducted on the

charged directly with the enforcement of federal criminal laws—has refused to bring criminal action against broadcasters of such programs.[16] And in this very action, it is noteworthy that the Department of Justice has not joined the Commission in appealing the decision below.

---

program "Truth or Consequences" would be mailable. While earlier rulings on a "give-away" program called "Mu$ico" had been to the contrary, the Solicitor in 1949 informally advised that the material relating to the program would be mailable. These unreported rulings were made part of the record below.

In accord with these rulings, the Solicitor in 1947 had instructed local postmasters that at least "an expenditure of substantial effort or time" was required in order to find an enterprise to be a "lottery, gift enterprise, or similar scheme." The instructions provided:

"In order for a prize scheme to be held in violation of this section, it is necessary to show (in addition to the fact that the prizes are awarded by means of lot or chance) that the 'consideration' involves, for example, the payment of money for the purchase of merchandise, chance or admission ticket, or as payment on an account, or requires an expenditure of substantial effort or time. *On the other hand, if it is required merely that one's name be registered at a store in order to be eligible for the prize, consideration is not deemed to be present.*" (Italics added.) Postal Bulletin, Feb. 13, 1947. The italicized language, *supra,* was judicially confirmed in *Garden City Chamber of Commerce, Inc.* v. *Wagner,* 100 F. Supp. 769 (E. D. N. Y.), stay denied, 192 F. 2d 240 (C. A. 2d Cir.). In 1953, on the basis of the *Garden City* case and the District Court decision in this case, the Solicitor issued new instructions further narrowing the meaning of "an expenditure of substantial effort or time." Postal Bulletin, June 4, 1953.

[16] Apparently no prosecutions have ever been instituted under either the former § 316 of the Communications Act or the present § 1304 of the Criminal Code. In a series of letters made part of the record below, the Chairman of the Commission in 1940 urged the Attorney General to institute criminal proceedings against a number of stations because of their broadcasting of "give-away" programs similar to those involved here. In response to each letter, the Attorney General advised that "careful consideration has been given to this matter and it has been concluded that no action is warranted by this Department."

It is true, as contended by the Commission, that these are not criminal cases, but it is a criminal statute that we must interpret. There cannot be one construction for the Federal Communications Commission and another for the Department of Justice. If we should give § 1304 the broad construction urged by the Commission, the same construction would likewise apply in criminal cases. We do not believe this construction can be sustained. Not only does it lack support in the decided cases, judicial and administrative, but also it would do violence to the well-established principle that penal statutes are to be construed strictly.

It is apparent that these so-called "give-away" programs have long been a matter of concern to the Federal Communications Commission; that it believes these programs to be the old lottery ·evil under a new guise, and that they should be struck down as illegal devices appealing to cupidity and the gambling spirit. It unsuccessfully sought to have the Department of Justice take criminal action against them.[17] Likewise, without success, it urged Congress to amend the law to specifically prohibit them.[18] The Commission now seeks to accomplish the same result through agency regulations. In doing so, the Commission has overstepped the boundaries of interpretation and hence has exceeded its rule-making power.

---

[17] See note 16, *supra.*

[18] In a letter made part of the record below, the Chairman of the Commission in 1943 urged the Senate Interstate Commerce Committee to approve a proposed amendment to § 316 of the Communications Act, later to become § 1304 of the Criminal Code. The proposed amendment would have retained the existing language as to "any lottery, gift enterprise, or similar scheme," but would have extended the prohibition to "any program which offers money, prizes, or other gifts to members of the radio audience (as distinguished from the studio audience) selected in whole or in part by lot or chance." No action was ever taken on the proposal.

Regardless of the doubts held by the Commission and others as to the social value of the programs here under consideration, such administrative expansion of § 1304 does not provide the remedy.[19]

The judgments are

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the decision of these cases.

---

[19] Cf. *United States* v. *Halseth,* 342 U. S. 277, 280–281.