# Legality Under Anti-Lottery Laws of Amendments to Simultaneous Oil and Gas Leasing Procedures

The amendment of the Simultaneous Oil and Gas (SOG) Leasing Procedures to clarify the discretion of the Secretary of the Interior to decline to award leases to applicants whose names are drawn under the SOG procedures, provides some additional support for the conclusion in the April 7, 1980, OLC memorandum that the SOG program is not a prohibited lottery within the scope of 18 U.S.C. §§ 1302 and 1304.

Serious legal difficulties would arise if the SOG regulations were amended to establish a multiple filing system which would give preference to those willing and able to pay the most for lease opportunities, because of the statutory requirement that oil and gas leases be awarded not to the highest bidder but to the first qualified person making application to hold a lease. Moreover, insofar as a multiple filing system would tax lease applicants by making their chances depend on the size of their payments, and potentially enrich the government, it might be considered a violation of the anti-lottery laws.

In the absence of a specific statutory limitation on the amount which may be charged each applicant for a lease, the Secretary is authorized to increase the present fee to a level that more accurately reflects the actual cost of administering the system.

June 8, 1981

## MEMORANDUM OPINION FOR THE DEPUTY SOLICITOR, DEPARTMENT OF THE INTERIOR

You have requested the views of this Office on two legal questions that involve the Simultaneous Oil and Gas (SOG) Leasing Procedures. Both of these questions were prompted in part by a memorandum issued by this Office on April 7, 1980, *Applicability of Anti-Lottery Laws to Simultaneous Oil and Gas Leasing Procedures,* 4 Op. O.L.C. 557 (1980). In that memorandum we expressed the view that the random lease allocation system established by these procedures is not a prohibited "lottery" within the meaning of 18 U.S.C. §§ 1302 and 1304. Those statutes are discussed in detail in that memorandum.

Your first question concerns a recent change in the SOG regulations. Although it has always been the law that the Secretary of the Interior has discretion to decline to award leases to applicants whose names are drawn under the SOG procedures, some portions of the old regulations did not expressly recognize that discretion. *See, e.g.,* 43 C.F.R. § 3112.4-1 (1979) (a lease "will be issued to the first drawee qualified to receive a lease"). The regulations have now been amended to establish an offer and acceptance procedure that is more clearly in harmony with

153

the Secretary's discretionary power.[1] You ask whether this change in the regulation alters our previous conclusion that the SOG program falls within the usual legal definition of a lottery[2] but is not a prohibited lottery within the meaning of §§ 1302 and 1304.

In our previous memorandum we took note of the argument that the Secretary's residual discretion distinguishes the SOG program from some kinds of lotteries. *See* 4 Op. O.L.C. at 561. We concluded, however, that the existence of discretion in the Secretary does not in itself make a decisive legal difference in the interpretation of the criminal statutes. The purpose of the SOG procedures is to "manage the crowd" while implementing the Secretary's responsibility to award leases to the first qualified persons making application. The system operates by allotting things of value (oil and gas leases) among multiple qualified applicants on the basis of chance. That is the effect of the procedures whenever the Secretary, in his discretion, awards a lease to a randomly selected applicant. Whenever that occurs, the SOG procedures so clearly resemble a "lottery" that there would be a substantial question concerning their legality if Congress had intended in the relevant criminal statutes to suppress lotteries of every kind. As you know, we concluded in our previous memorandum that Congress did not intend to suppress certain "lotteries" employed by officers of the United States in the due administration of their statutory powers, if such lotteries are not designed to enrich the "promoters."

The change in the old regulation to reflect more clearly the scope of the Secretary's discretion does not affect our previous analysis or the conclusion articulated in the April 7, 1980, opinion. If anything, the clarification of the regulation with respect to the Secretary's discretion provides a small measure of additional support for our conclusion that the SOG program, in its present form, is a reasonable attempt by the Secretary to carry out a function assigned to him by statute and is not therefore a prohibited lottery within the scope of §§ 1302 and 1304.

Your second question concerns a proposal that has been made for further modification of the SOG procedures. Under the present system, each lease applicant is permitted, for a nominal fee, to file a single application for a given lease; and all qualified applicants have an equal chance of being selected under the random selection process. It has been suggested that this system could be changed to permit applicants to make an unlimited number of applications. The application fee could remain the same ($10 for each application), or it could be raised. In either case, the amended system would permit each applicant to purchase as many chances for a lease as he desired, while requiring him to

---

[1] The new regulations are set out in 45 Fed. Reg. 35,164 (May 1980). In general, they provide that an applicant whose name is drawn under the SOG procedures may execute and tender a lease agreement, together with a year's rent, which the Secretary may then accept or reject in his discretion.

[2] *See* FCC v. *American Broadcasting Co.*, 347 U.S. 284 (1954).

pay proportionately for that privilege. Thus, if an applicant wished to purchase 1,000 chances, he would pay the Department $10,000, assuming the application fee remained $10; he would pay $10,000 for 500 chances if the fee were increased to $20 per application.

You note that in our previous memorandum we attributed some significance to the fact that the present SOG "lottery" does not enrich federal coffers and does not encourage "gambling" by permitting applicants to purchase more than one chance for a lease. In light of that position, you ask whether we would take a different view of the "lottery" issue if the SOG regulations were amended to permit multiple filings either at the present $10 fee or at an increased fee. You also ask whether our views would be altered if the present single filing system were retained but the application fee were increased to generate greater revenues for the government. We will address those questions in turn.

1. *Multiple filing.* We have carefully reviewed with appropriate officials within your Department the policy reasons behind your consideration of a multiple filing system. We understand that the SOG program is not entirely satisfactory from a policy standpoint. As presently administered, it is inefficient economically, for it does not allocate leases to the applicants who are most qualified to explore for oil and gas. It has produced a private assignment market in which leases obtained by applicants who have no intention of exploring for oil or gas are sold to bona fide exploration companies for impressive profits. It encourages fraud by creating an economic incentive for violation of the single application rule. The suggestion has been made that these problems could be ameliorated, or perhaps even cured, if applicants were permitted to register the strength of their desires for a given lease by purchasing multiple chances at an aggregate price that would approximate the "true" value of the exploration opportunity represented by the lease.

We do not question the merit of the policy argument, but we think that serious legal difficulties would arise if the SOG program were amended to establish a multiple filing system. We could not recommend that such a change be made without further statutory authorization.

The primary problem is that the change would make it more difficult to argue that the SOG system is an otherwise lawful and reasonable means of carrying forward the underlying statutory mandate—the requirement that the Secretary award these leases, not to the highest bidders, but to the persons "first making application" who are "qualified to hold a lease." *See* 30 U.S.C. § 226(c). The random selection process was sustained in *Thor-Westcliffe Development, Inc.* v. *Udall,* 314 F.2d 257 (D.C. Cir. 1963), as a reasonable means of "managing the crowd" while complying with that mandate; but if the system were changed to authorize multiple filings at prices that would depend on the number of filings made by each applicant, the Secretary would be "managing the crowd" by giving an advantage to those applicants who

155

are willing and able to pay the most for lease opportunities. We think it would be difficult to reconcile that preference with the legislative intention that appears on the face of the leasing statute. Among otherwise qualified applicants,[3] the willingness of one applicant to pay more than the others for a chance at a lease may be some indication of the relative strength of his desire to exploit the exploration opportunity; it may also be nothing more than an indication of his willingness to risk more money to obtain a lease that can be sold on the assignment market. In any case, there is no suggestion in the statute that an applicant's willingness to pay more should entitle him to priority over the other qualified applicants, all of whom seek a place in line.[4] Congress has mandated that the lease should be awarded not to the person who is willing to pay the most, but to the person "first making application." In complying with that mandate the Department has long taken the position that all applicants should be given an "equal chance" for a lease. The single application rule was adopted for that very reason. That interpretation of the statute has been approved by the courts, *see McKay* v. *Wahlenmaier,* 226 F.2d 35 (D.C. Cir. 1955); and it has been tacitly accepted by Congress, a fact noted in our previous memorandum.

Without further legislation, the question of authorization is made more problematic by the statutory prohibition against "lotteries." We must construe the Acts of Congress harmoniously where such a construction is possible. Implied amendments or repeals are disfavored, and that principle is relevant here. It is one thing to conclude, as the court concluded in *Thor-Westcliffe Development, Inc.* v. *Udall, supra,* that Congress has impliedly authorized the Secretary to pick randomly among a crowd of applicants when he has no more effective means of determining who is "first" while maintaining order in the queue; but it is quite another to conclude that Congress has impliedly authorized a system to multiple filings that would bear not only a formal, but also a substantive resemblance to devices that Congress has condemned in other legislation. Through the criminal statutes Congress has sought to suppress lotteries designed to tax the public and to enrich the "promoters." A multiple filing system would tax lease applicants by making their chances depend on the size of their payments; and it could enrich the government, depending on the actual cost of administrative system

---

[3] The statute suggests that virtually any citizen of the United States is "qualified" to hold a lease, subject to certain statutory ceilings on aggregate lease holdings. *See* 30 U.S.C. §§ 181 and 184. The relevant regulations reflect that interpretation of the statute. *See* 43 C.F.R. § 3102 1 *et seq.*

[4] The legislative history of the leasing statute is consistent with the view that the size of an applicant's payments should not entitle him to priority The lease system replaced the old system of prospecting permits for land containing no known deposits of oil and gas; yet in replacing the old system, Congress ultimately declined to subject the new prospecting leases to competitive bidding. Congress thereby preserved the central feature of the prospecting system—the preference given to the "first" claimant, whatever his financial resources. *See* Act of August 21, 1935, ch. 599, 49 Stat. 674; *see also* 79 Cong. Rec. S12075 (July 30, 1935) (remarks of Senator Pittman); *see also* Act of August 8, 1946, ch 916, § 3, 60 Stat. 951; *see also* S. Rep. No. 1392, 79th Cong., 2d Sess. (1946).

and the number of chances purchased by the applicants in a particular case. Since, as we noted in our earlier memorandum, Congress was concerned with the moral issues presented by schemes in which persons are encouraged to risk their resources on the chance of a windfall, we are concerned that a multiple filing system would appear to do precisely that and might therefore be considered a violation of the anti-lottery laws. In general, the more closely the leasing system resembles otherwise prohibited lotteries, the more difficult it becomes to sustain the system under the leasing statute, for the leasing statute cannot authorize an otherwise prohibited lottery without impliedly amending the criminal statutes *pro tanto.*

2. *Single filing, increased fee.* You have asked whether any legal difficulty would be presented by a simple increase in the $10 filing fee. We understand from conversations with officials in your Department that under the options now being considered, the increase would be justified by the increased cost of administering the SOG procedures.

Congress has declared generally that any "privilege, authority, use, franchise, license, permit, certificate, registration or similar thing of value" issued by a federal agency shall be "self-sustaining to the full extent possible"; and to that end Congress has authorized the head of each federal agency to prescribe uniform fees to be charged in connection with the issuance of "things of value." *See* 131 U.S.C. § 483a. In fixing the amount of such a fee, the agency head is entitled to take into account a number of factors, including the direct and indirect cost to the government, the value of the thing to the recipient, and the public policy or interest to be served in charging the fee. *Id.*

We are unaware of any specific statutory limitation that would supersede this general authority in the case of fees charged for SOG applications. In the absence of a specific statutory limitation, we believe the Secretary is authorized by 31 U.S.C. § 483a to increase the present $10 fee to a level that more adequately reflects the actual cost of administering the SOG system, a system which, in its present form, is authorized by the leasing statute. We do not believe that an increase would be held to violate the anti-lottery laws if it is rationally related to the administrative costs by the system and to the purpose of finding qualified applicants, and is not adopted for the purpose of enriching the federal government.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

157