The CAPLES COMPANY, a corporation, Petitioner,

v.

The UNITED STATES of America and the Federal Communications Commission, Respondents.

No. 13415.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 7, 1957.

Decided March 14, 1957.

Mr. Leonard H. Steibel, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of Court, with whom Messrs. D. F. Prince and Scott P. Crampton were on the brief, for petitioner.

Mr. Daniel R. Ohlbaum, Counsel, Federal Communications Commission, with whom Messrs. Warren E. Baker, Gen. Counsel, Federal Communications Commission, and Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, were on the brief, for respondent, Federal Communications Commission.

Mr. Daniel M. Friedman, Atty., Dept. of Justice, entered an appearance for respondent, United States of America.

Messrs. Robert L. Heald and Walter R. Powell, Jr., filed a brief on behalf of National Ass'n of Radio and Television Broadcasters, as amicus curiae, urging reversal.

Before BAZELON, FAHY and DANAHER, Circuit Judges.

BAZELON, Circuit Judge.

Upon "Application for a Declaratory Ruling," the Federal Communications Commission held that the television giveaway program known as "Play Marko" is a lottery under § 3.656 of the Commission's rules and regulations. The owner of the program, who filed the application, brought this petition for review of the ruling.

"Play Marko" is similar to the familiar game of "Bingo."[1] The participating viewers use cards which may be obtained

---

1. "Play Marko" is described as follows:

After the cards have been procured, the person procuring the cards tunes in on the Marko television program, where the Master of Ceremonies draws numbers from a cage or bowl, which numbers are exhibited to the viewing audience on a master board. As the numbers are drawn and announced to the audience, the viewer checks his cards and covers the corresponding number on his card * * *. During the progress of the game, if the viewer succeeds in covering a vertical or horizontal line or diagonal row of five numbers, he has completed a Marko. * * * At the point where a possible Marko is reached, the Master of Ceremonies announces one or more telephone

free of charge in any quantity by any person, but only from "stores handling the sponsor's products." [2] The participant is not required to register or make a purchase.

Petitioner contends that the Commission's ruling is contrary to the Supreme Court's decision in Federal Communications Comm. v. American Broadcasting Co., 1954, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699, construing earlier anti-lottery regulations. The Court held that, since the regulations were bottomed squarely on a criminal statute, 18 U.S.C. § 1304 (based upon § 316 of the Communications Act of 1934, 47 U.S.C. § 316), the regulations must be as strictly construed as the statute.[3] The statute, and therefore the regulations, said the Court, proscribe "(1) the distribution of *prizes;* (2) according to *chance;* (3) for a *consideration.*" 347 U.S. at page 290, 74 S. Ct. at page 598, emphasis supplied. In

that case, as in this, only the existence of *consideration* was in question. The Court found that, in the program there involved, "not a single home contestant is required to purchase anything or pay an admission price or *leave his home to visit the promoter's place of business;* the only effort required for participation is listening." Id. 347 U.S. at page 294, 74 S.Ct. at page 600, emphasis supplied. It held this effort alone insufficient consideration for the purposes of a penal statute.[4]

The Commission says American Broadcasting Co. is not controlling here because "Play Marko" requires something more than "listening," in that the cards necessary for participation can only be obtained from the sponsor's stores or outlets. The requirement of a visit by the participant, or someone on his behalf, is said to be a thing of value since it is of benefit to the sponsor.

numbers on which viewers with Markos can call in, announcing that they have Markos.

When a viewer phones the studio and announces that he has a Marko, the Master of Ceremonies, by means of a master book which contains all Marko card combinations, can check the file number on the card which the viewer gives him, and thus can verify by looking at the master book whether that player has actually in fact a Marko. The first player whose card is thus verified is declared the winner. The winners of the Marko games are awarded prizes in merchandise or U. S. Savings Bonds, which are donated by or through the sponsor of the Marko program.

2. The Commission limited its ruling to the situation "where most perssons will, or are required to go to a sponsor's store or to an establishment handling the sponsor's products in order to participate.

3. The present regulations, 47 C.F.R. § 3.656, are similarly bottomed on the criminal statute. They provide:

(a) An application for construction permit, license, renewal of license, or any other authorization for the operation of a television broadcast station, will not be granted where the applicant proposes to follow or continue to follow policy or practice of broadcasting or permitting "the broadcasting of any advertisement of or information concerning any lottery,

gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes." (See 18 U.S.C. § 1304).

(b) The determination whether a particular program comes within the provisions of paragraph (a) of this section depends on the facts of each case. However, the Commission will in any event consider that a program comes within the provisions of paragraph (a) of this section if in connection with such program a prize consisting of money or thing of value is awarded to any person whose selection is dependent in whole or in part upon lot or chance, if as a condition of winning or competing for such prize, such winner or winners are required to furnish any money or thing of value or are required to have in their possession any product sold, manufactured, furnished or distributed by a sponsor of a program broadcast on the station in question.

4. The give-away program involved in the American Broadcasting case required the home contestant to answer his telephone and, in some instances, to have sent his name to the station in advance of the broadcast. Since the Court did not refer to those required activities, it apparently viewed them as insignificant for decisional purposes.

We agree that the requirement of obtaining the cards from the sponsor's stores or outlets is something more than "listening" and, perhaps, makes the program here more objectionable. But the Commission tells us that its ruling "is not an expression of the Commission's judgment as to the quality or desirability of the program but an interpretation of a Federal statute specifically prohibiting the broadcast of lotteries." When the test laid down by the Supreme Court is applied, we conclude that "it would [still] be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime." Ibid. The undesirability of this type of programming is not enough to brand those responsible for it as criminals. Protection of the public interest will have to be sought by means not pegged so tightly to the criminal statute or in additional legislative authority.

Reversed.

DANAHER, Circuit Judge (dissenting).

The Caples Company filed an application with the Federal Communications Commission requesting a ruling "declaring that Marko is not a lottery as played on station KTLA-TV, Los Angeles, California, during the period from January 15, 1955 through May 28, 1955." Replying, the Commission stated that as a matter of general policy it had refrained from issuing advisory rulings pertaining to program content but, "it has been persuaded by the nationwide scope of the seriousness of the question involved, to depart from its policy in this case." After consideration of various aspects of the problem, the Commission's opinion concluded "that the television program 'Play Marko' as broadcast by station KTLA, is a lottery, and its presentation over the facilities

of a broadcast station would be in contravention of § 3.656 of the rules of the Commission."[1]

The Caples Company alleged that it is engaged in business as an advertising agency and is the owner of a television program entitled "Play Marko." Prior to May 4, 1955, Caples "in connection with its business and as owner of Marko, had entered into contracts, either directly with sponsors or with television stations which in turn procured sponsors pursuant to the terms of which contracts the said sponsors were authorized to televise Marko for the purpose of advertising their respective products and services, over various television stations throughout the United States," Caples told the Commission. The terms of any such contract have not been disclosed to us.

The petition in this court asks us to review and set aside the action of the Commission and that we "thereupon hold that Play Marko is not a lottery and that petitioner is entitled to a declaratory ruling to that effect." My colleagues woud reverse the action of the Commission, and since I do not agree, I am impelled to submit the reasons for the view I take of the problem.

Although many states have said judicially that a scheme like that presented here constitutes a lottery, in the name of the federal government it would now be said not to be. Although in such states the playing of such a game as Marko would be deemed to violate the laws and the public policy of such states for which prosecution might follow, by television the game may be sent into every home which chooses to permit it.

"The Communications Act of 1934 applies to every phase of television and it is clear that Congress intended the regulatory scheme set out by it therein to be exclusive of State action. See Section 301, 47 U.S.C.A. § 301,

---

1. 47 C.F.R. § 3.656, has been set forth in full in the majority opinion. Although certain cases will be specifically mentioned herein, it is unnecessary to cite the statute or otherwise to identify earlier Commission rules so recently detailed in F.C.C. v. American Broadcasting Co., 1954, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699, to which reference may be had.

which recites the purpose of the Act as, *inter alia,* the maintenance of ' * * * the control of the United States over all the channels of interstate and foreign radio transmission * * *' ".[2] Moreover, the Court has said, "The Act itself establishes that the Commission's powers are not limited to the engineering and technical aspects of regulation of radio communication. * * * But the Act does not restrict the Commission merely to supervision of the traffic. It puts upon the Commission the burden of determining the composition of that traffic."[3] When the Act was adopted in 1934, Congress prohibited the broadcasting of "* * * any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance. * * *." It authorized the Commission to promulgate rules governing the administration of the Act. "Indeed, the Commission would be remiss in its duties if it failed, in the exercise of its licensing authority, to aid in implementing the statute, either by general rule or by individual decisions."[4]

The Commission had adopted such rules and, by an individual decision, just as the Court instructed it to do, it has here decided that "Marko" as *played* over a *particular* station during a *particular* period, is inhibited by the statute and the rules.

My colleagues suggest that this case is controlled by the decision in the American Broadcasting Co. case, but as I read it, that is just such another "individual decision" within the Court's frame of reference, as the Commission is free to make in the individual case.

The American Broadcasting Co. situation is definitely not like ours.

The Court told us that the "give-away" programs, there considered, were not to be "struck down as illegal devices appealing to cupidity and the gambling spirit."[5] It recognized that whether a particular scheme constituted a lottery depended upon the peculiar facts in each situation. "The courts have defined consideration in various ways, but so far as we are aware none has ever held that a contestant's listening at home to a radio or television program satisfies the consideration requirement."[6] It noted particularly that the consideration requirement is satisfied in certain situations where free chances are given to persons "who go to a store to register in order to participate in the drawing of a prize, and similarly by a 'bank night' scheme giving free chances to persons who gather in front of a motion picture theatre in order to participate in a drawing held for the primary benefit of the paid patrons of the theatre."[7] The instant case, it seems to me, comes squarely within the last mentioned categories.

The Court continued: "But *such cases differ substantially from the case before us.* To be eligible for a prize on the 'give-away' programs *involved here,* not a single home contestant is required to purchase anything or pay an admission price or *leave his home to visit the promoter's place of business;* the only effort required for participation is listening."[8] (Emphasis supplied.) As I read the opinion, the Court ruled that "such programs" fail to achieve a criminal character but it limited its holding to the facts in the cases before it.

2. Allen B. Dumont Laboratories v. Carroll, 3 Cir., 1950, 184 F.2d 153, 155, certiorari denied, 1951, 340 U.S. 929, 71 S. Ct. 490, 95 L.Ed. 670.

3. National Broadcasting Co. v. U. S., 1943, 319 U.S. 190, 215–216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344.

4. F.C.C. v. American Broadcasting Co., supra note 1, 347 U.S. at page 289, 74 S.Ct. at page 597.

5. Id., 347 U.S. at page 296, 74 S.Ct. at page 601.

6. Id., 347 U.S. at page 293, 74 S.Ct. at page 599.

7. Id., 347 U.S. at pages 293–294, 74 S.Ct. at pages 599–600.

8. Id., 347 U.S. at page 294, 74 S.Ct. at page 599.

The scheme herein considered by the Commission is totally unlike the "give-away" programs considered by the Court. The script of the Caples Company's telecast is before us, with complete instructions for both video and audio presentation. The audience is told of the valuable prizes to be won after a contestant has acquired a card of a certain color, varied each week, and serially numbered, which may be procured free from one of the sponsors. The card is arranged in squares, each containing a number, with 25 numbers displayed, 5 in horizontal rows and 5 in vertical columns. In the studio, numbers appearing on small balls, are drawn from a container. The numbers so drawn are announced and are displayed to the audience. Each contestant, if he has a called number on his card, thereupon covers that number, and when he shall have completed a row of 5 numbers, whether in a vertical or horizontal line, or diagonal row, he has completed a Marko. The master of ceremonies is instructed thus: He is to draw numbers until there is a possible Marko whereupon he announces a telephone number, and then the script says: "If Marco was hit in 5 numbers MC should pull a few more balls with: 'Looks like we really hit a possible Marco fast this time and since the odds are against hitting on so few numbers, let's draw just a couple more.' MC then stops action, explains briefly how Marco was possible."[9] The MC is next told to say: "If you have a Marco, phone this number right away! If you Do Not have a Marco, clear your card. Game #—— is over! Get set for the next game which follows this message from [announcer]."

The announcer is told to say: "Every Saturday night, tune in to KTLA and Play Marco * * * just like Bingo. Complete instructions will be given on every program."

Although it is represented that the first contestant to call with a card verified as correct, will win a prize, the decision of the "MC" is final, and if no cards are being checked out as containing a "winning" combination, the preceding game is declared null and void, with a forfeit of the prize which thereafter will be played for in a later game on the program. The instructions continue: "Chances are 1 or 2 cards will be in the process of being checked. In this case, MC announces he wants to take a minute to give those players now on the phone a chance to win—but that no new calls will be received. MC will have to stall for 20-30 seconds until disposition is made of cards being checked." If a winner is found, a prize will be awarded, the script says, but the preceding game must always be disposed of before announcing the numbers for the game next to be played. Each person who achieves a Marko is told to send in a card or letter with the following information: (1) the serial number of the card; (2) the game number and date on which the Marko was achieved; (3) the direction and numbers making the Marko; (4) the name and address of the contestant. When verified as having a Marko, the contestant is awarded a portrait to be taken at a certain studio and his name will be listed as one of the "special Marco winners who will play * * * right at home * * * for our Grand Prize, April 30th." The

---

9. We are not told how many balls bearing numbers are placed in the container. We are not told how many balls bearing the *same* numbers are placed there. According to the laws of mathematics the number of possible combinations of numbers from 1 to 75 (or 1–99, for that matter) will run into the thousands. That the odds favoring the achievement of a "Marko" may be manipulated and controlled is obvious, for combinations of winning num- bers and winning numbers only, may multiply many times, depending upon the intended speed of the game, the odds to be overcome and similar factors in the sole and unregulated control of the promoter. In the absence of permitted supervision of the play, there is no assurance that the "winning" file numbered cards are in the hands of the public—or even that there is in fact a "winner."

grand prize, the contestants are assured, is a "Polar Flight" in a "fabulous First Class, Royal Viking deluxe flight SK 932 via Scandinavian Air Lines direct to Europe from Los Angeles over the 'top of the world'! Arrangements for your flight and hotel accommodations in Copenhagen, Amsterdam, Brussels and Paris will be handled by [a travel bureau]." Everyone who achieves a Marko, whether he wins a prize or not, is to receive the portrait and will qualify for the grand prize.

We need not describe other prizes or supply additional details, for enough has been said to indicate what the record shows as to the nature of the game and the manner of its conduct, "as played on station KTLA-TV" over the particular period. How it *may* be played elsewhere if free from all supervision and control is purely speculative to be sure. But frequent "winners" and prize announcements, we may assume, will add to the interest of contestants and stimulate their weekly procurement of current cards with resulting multiplication of visits to the sponsors' stores. One such sponsor was said to have 150 outlets offering the cards described. This is surely a far cry from the scheme considered in the American Broadcasting case.

I suppose my colleagues would agree that if each player were to pay $5 for a card enabling him to participate, the proceeds of the sale of which cards to constitute a fund to be distributed to "winners," there would be no problem as to "consideration." I assume the same to be true if the cost of the card were reduced to $1, or even to 10¢. In principle, if a fund similarly raised were used to purchase prizes to be distributed, we would all agree.

Here, the advertising agency, the owner of the game, as a result of contracts with its sponsors, arranges for the stake. The agency and the sponors, in one way or other, create the fund. They put up the money, or they buy the prizes. They provide the considera-

tion which makes up the stake, as surely as though the operator of a roulette wheel staked a player to join a game at the casino.

Someone plans a weekly change of the player's cards, distributes the numbered cards to the outlets of the sponsors, provides for special telephone number services, assigns the studio crew and a master of ceremonies, arranges the odds to be met by the contestants conformably both to the numbers on the cards and the numbers on the balls in the container. If it be the advertising agency which conducts the game, we may conclude it is paid for its services by the supporting sponsors who likewise, we may assume, pay for the United States Savings Bonds, the trip to Europe and the other prizes awarded. The contestants must go to a store to procure their cards, must conform to the announced requirements of play, must telephone to the studio numbers, and, to qualify for the grand prize, must send in a card or letter conveying certain information. The monetary consideration supplied for and in behalf of the contestants to provide the stake, coupled with the actions and participation required of the players, and the presence of the patrons at the various stores, available to the blandishments of salesmanship, combine to constitute the element of consideration. Without these various steps in such combination, there would be no prize and no gamble. Similarly, without the inducement involved, we may assume that contestants and television viewers alike would find little interest in Marko, "just like Bingo." That it is believed by the sponsors to be well worth their while follows from their willingness to meet the cost of the enterprise.

I think the Commission properly concluded that there was here sufficient consideration "either explicit or practical", as it said, to take this case completely out of the range of the American Broadcasting Co. rule. This was no mere entertainment or "give-away." It was a "similar scheme" not unlike a

lottery, such as the Commission in sole control of radio communication throughout the nation, was bound to proscribe.[10]

I would affirm the Commission.

---

10. That the Commission's ruling properly defers to the policy and the law in many states cannot be doubted, especially where "consideration" has been found in circumstances generally far less compelling than confront us. See Affiliated Enterprises, Inc., v. Waller, 1939, 1 Terry, Del., 28, 5 A.2d 257; State ex rel. Beck v. Fox Kansas Theatre Co., 1936, 144 Kan. 687, 62 P.2d 929, 109 A.L.R. 698; Sproat-Temple Theatre Corp. v. Colonial Theatrical Enterprise, Inc., 1936, 276 Mich. 127, 267 N.W. 602; State ex rel. Line v. Grant, 1956, 162 Neb. 210, 75 N.W.2d 611; Troy Amusement Co. v. Attenweiler, 64 Ohio App. 105, 28 N.E.2d 207, affirmed 1940, 137 Ohio St. 460, 30 N.E.2d 799; Knox Industries Corp. v. State ex rel. Scanland, Okl.1953, 258 P.2d 910; State ex rel. Draper v. Lynch, 1943, 192 Okl. 497, 137 P.2d 949; State v. Danz, 1926, 140 Wash. 546, 250 P. 37, 48 A.L.R. 1109; State v. Laven, 270 Wis. 524, 71 N.W.2d 287 (1955); State ex rel. Regez v. Blumer, 1940, 236 Wis. 129, 294 N.W. 491; State ex rel. Cowie v. La Crosse Theaters Co., 1939, 232 Wis. 153, 286 N.W. 707; State v. Wilson, 1938, 109 Vt. 349, 196 A. 757; Maughs v. Porter, 1931, 157 Va. 415, 161 S.E. 242.