PEOPLE *v.* BRUNDAGE.

1. LOTTERIES—CONSTITUTIONAL LAW.
    The Constitution of this State prohibits the legislature from authorizing any lottery or permitting the sale of lottery tickets (Const 1963, art 4, § 41).

2. SAME—STATUTES.
    Lotteries are specifically prohibited in this State by statute (CL 1948, § 750.372).

3. SAME—STATUTES—DEFINITION.
    The statute prohibiting lotteries gives no definition of a lottery, but the essential elements of a lottery have been established by judicial decision as (1) a consideration, (2) a prize, and (3) a chance (CL 1948, § 750.372).

4. SAME—INDIRECT CONSIDERATION.
    Indirect consideration was, under early decision, sufficient to establish the conduct of a lottery where the remaining elements of a prize and chance were also present (CL 1948, § 750.372).

5. SAME—STATUTES—LEGISLATIVE INTENT.
    The purpose of the lottery statute is to prevent the mulcting or cheating of the public by the sale of gambling chances (CL 1948, § 750.372).

6. SAME—PURPOSE OF STATUTE—CONSIDERATION.
    The evil sought to be eradicated by the lottery statute was the impoverishment of the participant, and the enrichment of the promoter of the scheme, but this evil results only when the participant pays something valuable for the chance to win a prize (CL 1948, § 750.372).

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 5, 6]  34 Am Jur, Lotteries § 19.
[3]  34 Am Jur, Lotteries § 3.
[4]  34 Am Jur, Lotteries § 4.
[7, 8]  34 Am Jur, Lotteries § 8.

7. Criminal Law—Lottery—Consideration—Instructions.

> Instructions of trial court in prosecution for operation of a lottery that adequate consideration existed to find defendant guilty of operating a lottery if it found that one must leave home to participate, to have his weekly card punched, and to be present for the drawing *held*, reversible error, where instructions amounted, in effect, to a directed verdict for the State and are contrary to the current thinking on the subject of the consideration necessary to establish a lottery (CL 1948, § 750.372).

8. Same—Lottery—Consideration.

> Conviction of defendant's store manager for the operation of a lottery *held*, error where the alleged lottery consisted of a promotional scheme requiring that one seeking to win a cash prize register at defendant's store, have his registration card punched each week at the store to be eligible for that week's prize, and appear at a booth in defendant's parking lot to claim his prize within 5 minutes after announcement that he has won the weekly drawing, since a lottery does not exist unless the participants are required to pay something valuable for the chance to win a prize (CL 1948, § 750.372).

Appeal from Monroe; Weipert (William J., Jr.), J. Submitted Division 2 April 6, 1967, at Detroit. (Docket No. 2,714.) Decided July 10, 1967. Leave to appeal granted October 31, 1967. See 379 Mich 786, 381 Mich 399.

Clayton Brundage was convicted of operating a lottery. Defendant appeals. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Paul E. Braunlich,* Prosecuting Attorney, for the people.

*Harry A. Lockwood,* for defendant.

Fitzgerald, J. The defendant, Clayton Brundage, was manager of a store known as Bargain City in Frenchtown township, Monroe county, Michigan. In his capacity as manager, he instituted a "business promotion" scheme known as Goodwill Cash Night.

For this activity he was charged with operating a lottery and convicted following jury trial. From this he appeals, claiming the jury was improperly instructed.

To understand the mechanics of the promotion, the following undisputed facts are relevant:

(A) A week before the date of the first drawing, a clerk is at the store to register any visitors or customers who come to the store. The clerk sits at a desk which is within the store near the front entrance but is not in the general sales area of the store.

(B) The clerk inquires of the store visitor or customer if he or she wishes to register—and if so, permits them to do so and explains that there is to be a drawing every week and that $200 will be drawn for on the nights of each drawing, being each Tuesday at 7:45 p.m. The registrant is informed that the drawing is free and it is not necessary to buy anything to be eligible.

(C) Upon registering on a master registration sheet, the registrant is given a "Weekly Qualification Card". The card sets forth the day and time of drawing, being Tuesday at 7:45 p.m., starting on Tuesday, June 21, 1966, and states the drawing is held outside in the store parking lot. The drawing is announced over a public address system heard inside and outside of the store.

(D) The "Weekly Qualification Card" further states that if your name is drawn you must present the qualified card to the judges on the platform within 5 minutes after your name has been announced in order to be declared the weekly winner. In addition to the weekly drawing, 2 consolation drawings for $10 each are drawn and may be claimed if the registrant is present.

(E) The "Weekly Qualification Card" is punched for the first week and the registrant is instructed that he or she must get it punched for subsequent weeks in order to be eligible for the subsequent drawings. Any cashier, store attendant, or the clerk at the registration booth may do this.

(F) One registration is good for all drawings, so long as the drawings continue.

(G) The master registration sheet is transcribed to alphabetical and numerical control cards which makes it impossible for a person who registers more than once to have more than one number in the drawing drum—thus every registrant has an equal chance on drawing night.

(H) The drawing is done by a child who picks one numbered tab from the drum. This numbered tab is compared to the numerical control card which the judges have and the name appearing on that card is declared the winner.

(I) If the winner does not appear to claim his prize, the money becomes a part of a larger prize to be awarded the following week. At the conclusion of the term of all drawings, any money not distributed on prior nights will be drawn for until a winner does appear so that the total sum agreed upon at the start of the drawings is disbursed to registrants.

(J) During the drawing, the person in charge states that it is not necessary to buy anything in the store in order to participate. The "Weekly Qualification Card" also states "that the awards are free and that you do not have to buy anything at any time, there is no consideration. It's all free."

Other undisputed facts are that a drawing in accordance with the above conditions was held on June 21, 1966, and Clayton Brundage knowingly permitted the setting up, managing, and drawing and the prosecution followed.

The defense as well as the prosecution sought a directed verdict. The court denied the motion in each case.

The court refused to give the instructions requested by the defense and the defendant objected to this omission and to the instructions given.

The requested instructions by the defendant were as follows:

"1. You are instructed that the essential elements for a conviction under the Michigan lottery statute are as follows:

"A. A chance,

"B. For a prize,

"C. For consideration.

"2. You are further instructed that in order for there to be consideration the same must have a significant value which is measurable. Consideration is defined as the payment by the participants of something of significant value for the right or privilege of participating in the drawing.

"3. The consideration necessary to prove a lottery must come from the participants in the form of a payment for their chance to win. The payment by the participant must be one possessing value and may not be insignificant or having a value which is not easy to comprehend.

"4. You are instructed that you may aid yourself in determining what a valuable consideration is by considering the purpose for which the lottery statute was passed.

"5. The Michigan lottery statute was passed to prevent the mulcting or cheating of the public by the sale of gambling chances. The evil sought to be eradicated by the lottery statute was the impoverishment of the participant, and the enrichment of the promoter and this evil only results when the participant pays something valuable for the chance to win a prize.

"6. The prosecutor has the burden of proof, and beyond a reasonable doubt, to show to your satis-

faction that a participant in Goodwill Cash Night gave a valuable consideration for this privilege of participating in the drawing."

The lengthy instructions actually given by the trial court ultimately narrow down to the definition furnished the jury for the "consideration" element of a lottery.

The relevant instructions were as follows:

"Now I will say much the same thing in a little more explicit detail. The court charges and instructs the jury, the mere fact that the game, so-called, that is before you is said to be free, or the mere fact that no purchases at the store are necessary, does not mean that there is not a consideration. Consideration, the court rules, can be direct, that is, patrons paying for the lottery tickets, which, of course, is strictly forbidden in this State, or it can be indirect, as the proofs can show; attracting persons to a store who would not otherwise come is an indirect form, which the court rules is sufficient to make it a lottery. Where there is such indirect consideration the court charges the law to be, it suffices to satisfy the charge of lottery if you also find that there was a prize awarded and there was the element of chance, which both have been agreed by the people and the defense counsel.

"The jury is instructed that the presence of the participating members of the public for the distribution of the weekly qualification cards, which must be punched at the Bargain City store by an employee, and the fact that a prize winner whose number is drawn by chance has to be present at the drawing on the night of the drawing, that under our Michigan law is sufficient consideration to make it a lottery. It tends to attract others. It is clearly intended to attract others to the store, who would not have otherwise come, and in this way the store profits, in effect, in this case. The undisputed facts show that the defendant and his store, of which he is

manager, bargained with the public and promised them a so-called free chance, meaning there is no charge made, or no purchase need be made, for a lottery, if they give this consideration, if they come and do these things, and the doing of those things is sufficient.

"The court instructs the jury that if you find you must leave your home to participate, that is, go to Bargain City to register, and have your weekly card punched, and be present for the drawing, or take some active part in the Goodwill Cash Night, that these requirements constitute sufficient consideration under the law. You are further instructed, while the patrons may not pay, and the defendant may not receive any direct fee, there is indirect fee both paid and received. Those obtaining prizes pay such consideration for them, and the business establishment reaps direct financial benefit."

Both counsel have ably presented their positions before this Court, the prosecution relying heavily on the concept of "indirect consideration" and the defense leaning more toward the concept that consideration in a lottery requires that the participant pay something valuable for the chance to win a prize.

This entire matter was studied exhaustively by the attorney general for this State in response to a letter directed to him by the Honorable George F. Montgomery, State representative, seeking an opinion relative to sales promotion schemes currently being used by various business enterprises operating in Michigan. We deem it appropriate to reproduce in full the attorney general's opinion containing as it does an exhaustive and penetrating analysis of Michigan case law on this point. Following is the opinion No. 4562, issued March 22, 1967, verbatim:

"You have sought my opinion concerning the application of Michigan statutory and case law to various sales promotion schemes currently being used by certain business enterprises operating in Michigan.

"As you have noted, these promotional schemes generally involve distribution at the promoter's place of business of some token, either with or without a purchase. The token is held by the consumer who, in order to win a prize, must successfully match his token with others, or receive a token with the right combination of numbers, letters or symbols.

"Article 4, § 41, of the Michigan Constitution of 1963 provides:

" 'The legislature shall not authorize any lottery nor permit the sale of lottery tickets.'

"In addition, Michigan has, for over a century, had a criminal statute prohibiting lotteries. Section 372 of the Michigan penal code, CL 1948, 750.372 (Stat Ann 1954 Rev § 28.604), provides:

" 'Any person who shall set up or promote within this State any lottery or gift enterprise for money, or shall dispose of any property, real or personal, goods, chattels or merchandise or valuable thing, by the way of lottery or gift enterprise, and any person who shall aid, either by printing or writing, or shall in any way be concerned in the setting up, managing or drawing of any such lottery or gift enterprise, or who shall in any house, shop or building owned or occupied by him or under his control, knowingly permit the setting up, managing or drawing of any such lottery or gift enterprise, or the sale of any lottery ticket or share of a ticket, or any other writing, certificate, bill, goods, chattels or merchandise, token or other device purporting or intended to entitle the holder or bearer or other person to any prize or gift, or to any share of or interest in any prize or gift to be drawn in any such lottery or gift enterprise, or who shall knowingly suffer money or other property to be raffled for in such house, shop or building, or to be there won by

throwing or using dice, or by any other game or course of chance, shall for every such offense be guilty of a misdemeanor, punishable by imprisonment in the State prison not more than 2 years or by a fine of not more than $1,000.'

"The background of Michigan's lottery prohibition was reviewed at some length by Justice CAMPBELL in *People* v. *Reilly* (1883), 50 Mich 384, 386, 387, in the course of which he stated:

" 'The statutes concerning lotteries, which go back into the territorial period, have from the beginning provided the same penalty of $2,000 as the fine which might be imposed. Act of June 30, 1828 (3 Terr L 687). This statute, which was "An act to suppress private lotteries," goes more into detail than the subsequent statutes, and shows very clearly that the evil aimed at was that class of schemes whereby large numbers of persons are enticed into purchasing tickets for the distribution of prizes in money or property upon some sort of drawing or allotment by chance. It is also to be noticed that one primary object was to punish such acts as the assumption of privileges, which it was then customary to grant to the aid of various public enterprises. Lotteries were frequently allowed to raise money for public improvements, such as schools, bridges, et cetera. Thus in 1805 four lotteries were authorized for the benefit of the city of Detroit, shortly after the destruction of the town by fire. 1 Terr L 67. Four lotteries were, allowed for the benefit of the University in 1817. 2 Terr L 105. Lotteries were also authorized in 1829 to secure free bridges and improved highway communication between Detroit and Monroe. 2 Terr L 731.

" 'By the Constitution of 1835 (art 12, § 6) it was provided that "no lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed." There can be no doubt what was meant by this language, and it clearly referred to the class of enterprises which had formerly been lawful if authorized by law, and criminal if unauthorized.'

"Several early cases decided by our Supreme Court also established certain basic concepts with regard to the prohibition against lotteries.

"In *People* v. *Elliott* (1889), 74 Mich 264, the Court defined a lottery in the following terms:

" 'A lottery is a scheme by which a result is reached by some action or means taken, and in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until the same has been accomplished. It was the obtaining of money or property by such means that our statute was intended to prevent and punish.' (pp 267, 268.)

"And in *Sproat-Temple Theatre Corp.* v. *Colonial Theatrical Enterprise, Inc.* (1936), 276 Mich 127, the Michigan Court indicated accord with the usually stated elements of a lottery. Namely: (1) consideration, (2) prize, and (3) chance.

"In *United-Detroit Theaters Corp.* v. *Colonial Theatrical Enterprise, Inc.* (1937), 280 Mich 425, 429, our Court, quoting from Ruling Case Law, with approval stated:

" 'It appears to have become the established American doctrine that, in order to constitute a lottery within the meaning of the various statutes, it is not necessary for the distribution of prizes to be purely by chance, but only for such distribution to be by chance as the dominating element, even though effected to some extent by the exercise of skill or judgment.' 17 RCL p 1225, § 12.

"The Supreme Court first considered the problem of promotional schemes under our lottery prohibitions in a series of cases involving suit clubs.

"In *People* v. *McPhee* (1905), 139 Mich 687, the Supreme Court stated:

" 'It cannot be denied that the respondent sought to, and presumably did, increase his business by a device or scheme, the feature of which, so far as securing patrons and customers was concerned, was the chance to obtain $20 worth of clothing for some

sum of money less than $20. It was calculated to, and did, appeal to the gambling propensity of men, was within the mischief at which the legislation is aimed, was within the terms of the statute, and, in our opinion, a disposition of property by way of lottery.' (pp 692, 693.)

"*People* v. *Wassmus* (1921), 214 Mich 42, involved prosecution of a defendant who sold suits for $48, payable $1 per week. Each week one customer had his suit discounted and received it without additional payment, regardless of the amount still owed. The Court held (p 45):

" 'It is contended that there is no element of chance in the transaction, that one buys a suit for $48 and gets it, and beside he may get his suit discounted before he makes 48 payments. Herein lies the element of chance. By purchasing a suit for $48 one gets the chance of acquiring it before he pays for it, or before he pays the $48. This chance is the seductive thing about the scheme and it is this which attracts the investor. But it may be said that there is no element of chance because there is no drawing, that the management itself selects the beneficiary; but this fact does not purge the transaction of all element of chance.'

"However, as the quoted language of these cases indicates, the Court at that time appears to have been primarily concerned with the element of chance in business promotion schemes. Here the question of whether the kinds of promotions referred to by you are lotteries centers around the element of consideration.

"This issue came before the Court in the theatre 'bank night' cases. *Sproat-Temple Theatre Corp.* v. *Colonial Theatrical Enterprise, Inc., supra,* involved the defendants' scheme to give cash prizes to some theater patrons without any charge except the usual admission ticket. The lower court held the scheme to be a lottery and issued an injunction. Upon appeal the Supreme Court affirmed stating:

" 'Defendants    *    *    *    contend that in view of the fact that the patron pays nothing for a chance to receive the prize, no consideration runs from the public, and, therefore, the statute is not violated.' (p 129.)

"The Court then quoted with approval from *Society Theatre* v. *City of Seattle* (1922), 118 Wash 258 (203 P 21), as follows:

" 'The elements of lottery are: First, a consideration, second, a prize, and third, a chance. It needs no argument to show that the second and third elements appear in the business conducted by respondents. But it is argued that the element of consideration does not appear because the patrons of the theaters pay no additional consideration for entrance thereto, and pay nothing whatever for tickets which may entitle them to prizes. But while the patrons may not pay, and the respondents may not receive, any direct consideration, there is an indirect consideration paid and received. The fact that prizes of more or less value are to be distributed will attract persons to the theaters who would not otherwise attend. In this manner those obtaining prizes pay considerations for them, and the theaters reap a direct financial benefit.' (pp 130, 131.)

"And the Michigan Court went on to summarize the effect of the lottery statute in these terms:

" 'PA 1931, No 328, § 372, definitely prohibits any lottery or gift enterprise within the State; and prohibits the disposition of any property, real or personal, goods, chattels or merchandise or valuable thing by way of lottery or gift enterprise; and provides punishment for a violation thereof. Our statutes do not attempt to define what a lottery is, but our Court has said that the essentials of a lottery are consideration, prize and chance.' (p 129.)

"*United-Detroit Theaters Corp.* v. *Colonial Theatrical Enterprise, Inc., supra,* involved a game called 'screeno' which the Court described as follows:

" 'The "screeno" cards are given to patrons of the theater with each admission ticket sold. The cards are not confined to purchasers of admission tickets, but are given upon request to any person in the foyer of the theater or to persons on the sidewalk in front of the theater.' (p 427.)

"The Court held as follows:

" 'Section 372 of the above act definitely prohibits any lottery or gift enterprise within the State. The three essential elements of a lottery are: consideration, prize and chance. (Citations omitted.)

" 'In Michigan we have held that an indirect consideration is sufficient. (Citations omitted.) * * *

" 'In the instant case the distribution of the tickets unquestionably attracted others to the theater who otherwise would not have attended and in this way the theater owner profited thereby. This is a sufficient consideration.' (pp 428, 429.)

"In *Glover* v. *Malloska* (1927), 238 Mich 216, suit was brought to enjoin an alleged lottery scheme. The facts were stated as follows:

" 'Defendant Malloska, doing business as the Lincoln Petroleum Products Company in the city of Flint, conceived the idea that it would aid his business of selling gasoline and oils to retail dealers to have tickets printed giving holders thereof a chance to draw an automobile at monthly drawings. Malloska procured the tickets, sold the same at a cent each to his customers, and let them give away the tickets to purchasers at their retail oil stations, or to any one asking for tickets without making a purchase. Once a month stubs of the tickets so given out were placed in a barrel, a drawing made, and the winner determined by chance.' (pp 217, 218.)

"The Court held:

" 'The scheme was clearly a lottery. (Citations omitted.) The often asserted essentials of a lottery, viz.: consideration, prize, and chance, were all present. Malloska sold the tickets to his customers for distribution by them in the course of trade to fur-

ther his pecuniary interest, and this established consideration.' (p 219.)

"More recently, however, the Michigan Supreme Court had occasion to review and to consider the effect of lottery statutes on commercial promotional schemes in the light of modern practices. The case was *ACF Wrigley Stores, Inc.* v. *Wayne Prosecuting Attorney* (1960), 359 Mich 215, a civil suit brought by a business enterprise to determine that its television program was not a lottery and to enjoin prosecution. In the Court's own language, the facts were as follows:

" 'The television program under question consists of drawing and televising numbers by the television station. The participant in his home, or elsewhere, observes a television screen and ascertains whether the numbers drawn match the vertical, horizontal, or diagonal set of numbers on his card. The participant may use a card distributed by plaintiff or he may prepare his own card, which participant forwards to the television station where it is registered and then returned to participant with notice of the broadcasting day on which the card may be used. If participant matches numbers, he notifies the broadcasting station and is awarded a prize.' (pp 217, 218.)

"Then, after considering applicable cases from this as well as other jurisdictions, the Court adopted the following language of the trial court as its opinion:

" 'Michigan statutes do not define lotteries. The elements of a lottery are not set forth in the statute and, therefore, this has been left to the courts.

" 'Our lottery statute has been on the books for many years and was passed to prevent the mulcting or cheating of the public by the sale of gambling chances.

" 'In 41 Georgetown L J, 556, 558, it is said that authority is only as good as the reason for it, and the evil sought to be eradicated by the lottery stat-

utes was the impoverishment of the participant, and the enrichment of the promoter of the scheme, but this evil results only when the participant pays something valuable for the chance to win a prize.

" 'It is the opinion of the court that these radio and television programs do not encourage gambling because the person is passive as far as the giveaway plan is concerned; also, it seems to follow that the radio and television programs are not included within the prohibitions of the statutes.

" 'The courts have been quite realistic in viewing giveaway programs only as a nuisance in our time and not as the evil of the century.

" 'The court therefore holds that television program "Play Marko" is not a lottery within the meaning of the statute.' (p 223.)

"The above review of the statute and the cases interpreting it indicates that a state of genuine doubt exists as to whether the kinds of promotional schemes described by you fall within the definition of a lottery. This being the case, it is questionable that a prosecution for criminal violation of the statute could be successfully maintained. I would therefore recommend that appropriate legislation be enacted clarifying the definition of the term 'lottery' in a manner which would permit prosecution for institution of business promotional schemes if such is the desire of the legislature.

"Another quote from the *Wrigley* case appears to be appropriate at this point. In arriving at its conclusion, the Court adopted with approval the following language of *Caples Company* v. *United States* (1957), 100 App DC 126 (243 F 2d 232):

" 'We conclude that "it would [still] be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime." *Ibid.* The undesirability of this type of programming is not enough to brand those responsible for it as criminals. Protection of the public interest will have to be sought by means not pegged so tightly to

the criminal statute or in additional legislative authority.'   (p 221.)

FRANK J. KELLEY
Attorney General"

The prosecution relies heavily on the fact that the listener in the *ACF Wrigley Case, supra,* was "passive" as opposed to being an "active" participant in the instant appeal.  We cannot subscribe to this distinction, based as it is upon the fact that one was conducted via television while the other was conducted in the parking lot of a store.

The court's instruction, telling the jury that consideration existed if it found that one must leave one's home to participate, to have the weekly card punched, and to be present for the drawing, amounted, in effect, to a direction of a verdict for the State. The instructions relative to consideration do not reflect the current thinking on the subject of consideration as expressed by the Supreme Court in *ACF Wrigley,* by the attorney general, or by this Court, and their use was error.

Reversed, defendant ordered released and his bond cancelled.

LESINSKI, C. J., and J. H. GILLIS, J., concurred.