# Applicability of Anti-Lottery Laws to Simultaneous Oil and Gas Leasing Procedures

The United States and its officers are not generally exempt from the anti-lottery laws, 18 U.S.C. §§ 1302 and 1304.

Although the question is not free from doubt, the legislative history and judicial construction of the anti-lottery statutes lead to the conclusion that those statutes are aimed at lotteries designed to enrich their promoters at the expense of the gambling public, and therefore do not extend to "lotteries" structured not to enrich federal coffers but for the sole purpose of distributing public leases fairly and efficiently.

Long-standing congressional acquiescence in the Interior Department's Simultaneous Oil and Gas Leasing Procedures is a factor that must be considered in determining whether those procedures constitute an illegal lottery under §§ 1302 and 1304.

April 7, 1980

## MEMORANDUM OPINION FOR
## THE SOLICITOR OF THE INTERIOR

This responds to your request for our opinion as to the applicability of the anti-lottery laws, 18 U.S.C. §§ 1302, 1304, to the Department of the Interior's Simultaneous Oil and Gas (SOG) Leasing Procedures. In our view, although the question is a close one, the SOG leasing program is not a "lottery" within the scope of §§ 1302 and 1304.

The SOG program is administered by the Department of the Interior pursuant to 30 U.S.C § 226(c), which provides that public lands not within any known geologic structure of a producing oil or gas field (commonly called "wildcat" lands) are subject to leasing to the first qualified person making application for a lease.[1] These leases are termed "noncompetitive" because the successful applicants obtain the leases without competitive bidding. Most federal oil and gas leases are obtained through noncompetitive leasing procedures.

To eliminate the chaos that sometimes resulted from competition among applicants seeking to be the "first qualified person making application," the Department of the Interior in 1960 promulgated a regula-

---

[1] Section 226(c) of title 30 reads as follows:

    If the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease of such lands without competitive bidding. Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease.

tion providing that all applications received by a specified filing deadline would be considered to have been submitted simultaneously.[2] If more than one qualifying application is received for a given tract, the priority of filing is determined by a public drawing.[3] To be considered, the entry card must be completed, signed, and accompanied by a filing fee of $10.00.[4] An applicant is permitted to file only one entry card for each parcel on the list, though there appears to be no bar to an applicant's filing on as many parcels as he or she wishes.[5] After the drawing is held, unsuccessful applicants are notified by the return of their entry cards in the mail.[6] The first qualified drawee is issued the lease upon payment of the first year's rental of $1.00 per acre. Tract sizes range from under 40 acres to a maximum of 2,560 acres. This procedure is often referred to as the government oil and gas "lottery."[7]

The regulation was challenged in *Thor-Westcliffe Development, Inc.* v. *Udall,* 314 F.2d 257, 258 (D.C. Cir.) *cert. denied,* 373 U.S. 951 (1963). The plaintiff argued that in providing for simultaneous filings, the regulation was unresponsive to the statutory command that the lease be given to the "person first making application." The court upheld the regulation after finding that, considering the language and purpose of the statute, as well as the experience of the Secretary in implementing it, the regulation was neither unreasonable nor inconsistent with the plain language of the statute. *Id.* at 260. The court explained:

> It must be owned that the procedure outlined in [the regulation], on superficial examination, bears little resemblance to the "person first making application" language of the statute. But Congress could hardly have supposed that granting $.50 per acre mineral leases can be accomplished as simply as the statutory language seems to indicate. . . . It is the Secretary's job to manage the crowd while complying with the requirement of the Act. [The regulation] is the Secretary's effort in this direction. We cannot say that it is an impermissible implementation of the statutory purpose.

---

[2] The regulation, 43 C.F.R. § 3112.2–1, provides:
> On the third Monday of each month, or the first working day thereafter, if the proper office is not officially open on the third Monday, there will be posted on the bulletin board in each proper office a list of the lands in leases which expired, were cancelled, were relinquished in whole or in part, or which terminated, together with a notice stating that such lands will become subject to the simultaneous filings of lease offers, from the time of such posting until 10 a.m. on the fifth working day thereafter. . . .

[3] 43 C.F.R. § 3112.2–1(a)(3).

[4] 43 C.F.R. § 3112.2–1(a).

[5] 43 C.F.R. § 3112.2–1(a)(2).

[6] 43 C.F.R. § 3112.2–1(4).

[7] *See* Nagdeman, *Land-Office Business: Public Participation in Oil Lease Lotteries Is Mounting Fast,* Barron's Feb. 14, 1977, at 11.

*Id.* Other cases have ruled on questions involving the simultaneous leasing procedure without discussing its legality.[8]

The question posed here is whether the drawing process constitutes a lottery within the scope of 18 U.S.C. §§ 1302 [9] and 1304.[10] By these enactments, Congress sought to curb both legal and illegal lotteries. *See* 4 Cong. Rec. 4061–64 (1876); 120 Cong. Rec. 41,827–29 (1974). We do not believe that the United States and its officers are generally exempted from the operation of these sections. *See generally Nardone* v. *United States,* 302 U.S. 379, 383–84 (1937); *United States* v. *Arizona,* 295 U.S. 174, 183–84 (1935).[11]

Both the Federal Communications Commission (FCC) and the Postal Service have received inquiries concerning this issue. In response to one such inquiry, the Postal Service wrote:

> As we have noted in response to occasional inquiries which we have received, we do not believe that Congress intended to include that type of activity by a federal agency within Section 1302's prohibitions. However, we would not purport to "determine" the applicablity of Section 1302, which is a criminal statute administered by the Department of Justice.[12]

The FCC staff expressed the view that § 1304 and FCC rules pursuant thereto [13] apply to the leasing program. A letter dated May 3, 1979,

---

[8] *See, e.g., Udall* v. *Tallman,* 380 U.S. 1, 3 n.1 (1965); *Ballard E. Spencer Trust, Inc.* v. *Morton,* 544 F.2d 1067 (10th Cir. 1976); *Burglin* v. *Morton,* 527 F.2d 486 (9th Cir. 1975), *cert. denied,* 425 U.S. 973 (1976).

[9] Section 1302 provides:

Whoever knowingly deposits in the mail, or sends or delivers by mail:

Any letter, package, postal card, or circular concerning any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance; . . .

Any check, draft, bill, money, postal note, or money order, for the purchase of any ticket or part thereof, or of any share or chance in any such lottery, gift enterprise, or scheme;

Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, or containing any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes; . . .

Shall be fined not more than $1,000 or imprisoned not more than two years, or both; and for any subsequent offense shall be imprisoned not more than five years.

[10] Section 1304 provides:

Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

[11] Generally, if acting in good faith and within the scope of their authority, federal officials are not subject to criminal liability for official acts. *See Clifton* v. *Cox,* 549 F.2d 722, 727 (9th Cir. 1977).

[12] Letter from George Davis, Assistant General Counsel, Consumer Protection Office, United States Postal Service, to Herbert Miller, Koteen & Burt (March 5, 1979).

[13] 47 C.F.R. § 73.1211.

from the Chief, Complaints and Compliance Division, Broadcast Bureau, FCC, to a law firm, quoted from a December 16, 1976. FCC staff letter to an inquirer as follows:

> Based upon precedent developed in the application· of the foregoing statutes [18 U.S.C. § 1304 and 503(b)(1)] it is our opinion that the method used by the Bureau of Land Management constitutes a lottery. [14]

The term "lottery" is not defined statutorily. The Supreme Court identified the elements of a "lottery" in the context of §§ 1302 and 1304 in *FCC* v. *American Broadcasting Co.,* 347 U.S. 284 (1954). The American Broadcasting Company was broadcasting advertisements for "give-away" programs which the FCC determined were lotteries, the broadcasting of which was prohibited by § 1304 and the FCC rules adopted pursuant thereto.[15] Finding the legislative history of the sections "unilluminating," the Court looked for guidance primarily to judicial and administrative decisions construing comparable anti-lottery legislation. *Id.* at 291–92. It wrote that there are three essential elements of a "lottery, gift enterprise, or similar scheme": (1) the distribution of prizes; (2) according to chance; (3) for a consideration. *Id.* at 290. In the "give-away" program considered in *American Broadcasting,* listeners selected on the basis of chance at home or in studio audiences received prizes as awards for correctly solving a given problem. Contestants were not required to purchase a product, pay an admission price or visit the promoter's place of business to be eligible to win. The Court stated:

> . . . So varied have been the techniques used by promoters to conceal the joint factors of price, chance, and consideration, and so clever have they been in applying these techniques to feigned as well as legitimate business activities, that it has often been difficult to apply the decision of one case to the facts of another.
>
> . . . The courts have defined consideration in various ways, but so far as we are aware none has ever held that a contestant's listening at home to a radio or television program satisfies the consideration requirement. . . .
>
> We believe that it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime. Particularly is this true when through the years the Post Office Department and

---

[14] The citation to "503(b)(1)" refers to 47 U.S.C. § 503(b)(1)(D), which provides:
(b) Any person who is determined by the Commission . . . to have—

* * * *

(D) violated any provision of section 1304 . . . of Title 18;
shall be liable to the United States for a forfeiture penalty.
[15] 47 C.F.R. § 73.1211.

> the Department of Justice have consistently given the
> words "lottery, gift enterprise, or similar scheme" a con-
> trary administrative interpretation.

*Id.* at 293-94. This decision was carried another step in *Caples Co.* v. *United States*, 243 F.2d 232 (D.C. Cir. 1957), in which the court ruled that there was no consideration, and thus no lottery, in a television give-away program even though the program did require participants to visit stores handling the sponsor's products.

If measured by the three-element definition identified by the Supreme Court in *American Broadcasting*, it would seem that the SOG program is a lottery. There is a distribution of "prizes." "Prize" in lottery contexts has been defined as a "thing of value" (*State* v. *Wassick*, 156 W. Va. 128, 191 S.E.2d 283 (1972)), and as "something offered or striven for in a contest of chance—something which may be won by chance" (*State* v. *Pinball Machines*, 404 P.2d 923, 926 (Alaska 1965)). A lease awarded by the drawing system grants the lessee the exclusive right to explore and drill for, extract, and dispose of oil and gas deposits (except helium gas) that may be found in the leased lands. These leases are issued for a 10-year term and so long thereafter as oil or gas is produced in paying quantities. The lessee is required to pay an annual rental fee, but the potential value of the lease in most cases far exceeds the fee paid.[16] Although wildcat lands may have no oil or gas deposits, the leases are "prizes" in that they provide the lessees an opportunity to realize substantial profits by selling the leases to a company capable of conducting the drilling operations, or by them-selves conduct drilling operations with the hope of reaping even greater profits. It is suggested that the prize element is lacking because the Secretary is not bound to grant the lease to the person whose card is first drawn. We fail to see how this affects the presence of the prize element, in that the program is based on the assumption that the lease will be awarded. The regulations provide that a "lease *will be issued* to the first drawee qualified to receive a lease upon payment of the first year's rental." 43 C.F.R. § 3112.4-1 (emphasis added).

The second element is "chance." Because the "winner" is determined by a public drawing, chance undeniably is part of the program.

The final element is consideration. Standard rules of contract law hold that consideration is either benefit to the promisor or detriment to the promisee. Corbin on Contracts, § 121 (1963). Money paid for the opportunity to participate, of course, generally would qualify as consideration. It could be argued that the term "consideration" as applied to a lottery requires that some financial benefit be sought by the operator of

---

[16] In one reported case, a retired stockbroker sold his lease to an oil company for a net profit of approximately $142,000. *A Monthly Oil Lease Raffle At $10.00 A Shot.* N.Y. Times, January 1, 1978, § 3, at 3, col. 1. In another, a successful applicant netted approximately $69,000, plus a 4 percent share of production payments should oil or gas be discovered on the land. Nagdeman, *supra,* note 7.

the lottery. The "classic" lottery involves a scheme in which tickets are sold by persons who look to the advance cash payments as a source of profit. According to the Department of the Interior, the filing fee is designed to cover only administrative costs; it does not go into a pool from which prizes are paid. In our opinion, however, this interpretation impermissibly stretches the term "consideration." Consideration is not determined by examining the purposes for which the money is collected. *See generally Dabbs* v. *International Minerals & Chemical Corp.*, 339 F. Supp. 654, 664 (N.D. Miss. 1972), *aff'd*, 474 F.2d 1344 (1973), *AMP Inc.*, v. *United States*, 389 F.2d 448, 454 (Ct. Cl.), *cert. denied*, 391 U.S. 964 (1968).

Although the SOG program appears to satisfy the three-element definition of "lottery" set forth in *American Broadcasting*, we nevertheless believe that §§ 1302 and 1304 should not be construed to cover the SOG program. The question is difficult, however, and any conclusion cannot be free from doubt. We rest our conclusion on the legislative history of the statutes, judicial approval of this and similar programs, and long-standing congressional acquiescence.

We note at the outset that the anti-lottery sections are penal statutes and therefore must be strictly construed. *United States* v. *Resnick*, 299 U.S. 207, 209 (1936); *United States* v. *Hartwell*, 6 Wall. 385, 395 (1867). General descriptions of classes of persons made subject to a criminal statute should be limited where literal application of the statute would lead to extreme results, and where the legislative purpose would be satisfied by a more limited application. *United States* v. *Katz*, 271 U.S. 354, 362 (1926); *United States* v. *Palmer*, 3 Wheat. 610, 631 (1818). *See also, FMC* v. *Seatrain Lines, Inc.*, 411 U.S. 726, 731–32 (1973). In *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537, 542 (1943), the Court emphasized that criminal statutes must be given "careful scrutiny lest those be brought within its reach who are not clearly included. . . ." After carefully reviewing the anti-lottery statutes, we conclude, on balance, that the statutes do not clearly include "lotteries" structured by government officials for the sole purpose of awarding public leases, and that the legislative purpose of the statutes is satisfied by this interpretation.

The legislative history of the first federal anti-lottery statutes, albeit scant, reveals congressional intent to suppress often fraudulent schemes to make money by means of lotteries. The first statute prohibiting use of the mails to promote lotteries was passed in 1872. Act of June 8, 1872, 17 Stat. 302. It read:

> That it shall not be lawful to convey by mail, nor to deposit in a post-office to be sent by mail, any letters or circulars concerning illegal lotteries, so-called gift-concerts, or other similar enterprises offering prizes, or concerning schemes devised and intended to deceive and

563

defraud the public for the purpose of obtaining money
under false pretenses, and a penalty of not more than five
hundred dollars nor less than one hundred dollars, with
costs of prosecution, is hereby imposed upon conviction,
in any Federal court, of the violation of this section.

In 1876, this statute was amended by deletion of the word "illegal"
before "lotteries," thus including even those lotteries declared legal
under state law. Act of July 12, 1876, 19 Stat. 90. It is clear from the
Senate debate of the amendment that the intent was to limit use of the
mail for all lottery purposes. 4 Cong. Rec. 4262-64 (1876). One Senator
pointed out that a lottery "fosters and encourages gambling and vice
. . . ruining many of the poorer portions of the community." *Id.* at
4262-63. Other Senators opined that lotteries were "demoralizing" and
"immoral." *Id.*[17] A definition of the term "lottery" appears neither in
the statute nor in the legislative history, but it is apparent from the
content of the debate that the type of lottery at which the statute was
aimed was a lottery designed to enrich its promoters at the expense of
the gambling public.[18] You have informed us that the SOG program is
designed not to enrich federal coffers, but to distribute the leases fairly
and efficiently. In addition, the SOG program differs from a traditional
lottery in that an individual may make only one application per lease,
thus minimizing the risk of "encouraging gambling."

As noted above, the program has been judicially approved as a
proper administrative interpretation of the enabling statute, 30 U.S.C.
§ 226(c). *Thor-Westcliffe Development, Inc.* v. *Udall, supra.*[19] Other
courts have approved selection by lot when the number of qualified
applicants for government licenses or other benefits far exceeds the
available number of such perquisites. *See Holmes* v. *New York City
Housing Authority,* 398 F.2d 262, 265 (2d Cir. 1968) (admission of
tenants to low-rent public housing projects); *Hornsby* v. *Allen,* 330 F.2d
55, 56 (5th Cir. 1964) (distribution of liquor licenses).[20] In *Hornsby,* the
court held: "If there are more applicants than licenses and all applicants

---

[17] The prohibition against broadcasting information concerning lotteries was added by the Commu-
nications Act of 1934, 48 Stat. 1088. The brief references to this section in the committee reports
provide no guidance as to the scope of the section. *See* S. Rep. No. 781, 73d Cong., 2d Sess. 8 (1934);
H.R. Rep. No. 1918, 73d Cong., 2d Sess. 49 (1934).

[18] In a different context, approximately twenty years after enactment of this statute, the Attorney
General defined a "lottery" as "an event which is merely contrived for the occasion." 21 Op. Att'y
Gen. 313, 317 (1896). The question arose in the context of a Postmaster General's request for the
Attorney General's opinion whether certain schemes of bond and investment companies were within
the scope of the statute. The Attorney General concluded that the schemes were in the nature of the
lottery covered by the statute, a predecessor of §§ 1302 and 1304. The SOG program, on the other
hand, is not merely contrived for the occasion. It is a means of awarding the leases in a nondiscrimina-
tory manner.

[19] Application of the penal anti-lottery statutes to the judicially approved and presumably statuto-
rily authorized program would contravene the general rule that, where possible, statutes are to be
construed harmoniously. *See generally Hyrup* v. *Kleppe,* 406 F. Supp. 214, 217 (D. Colo. 1976);
Sutherland, Statutory Construction § 53.01 (4th Ed. 1973 and Supp. 1979).

[20] In neither *Holmes* nor *Hornsby* was there any indication that the application had to be accompa-
nied by a filing fee.

564

are equally qualified to serve the general welfare, perhaps an unlikely event, then selection among them by lot or on the basis of the chronological order of application would meet constitutional requirements." *Id.* In none of these cases was the program in question challenged as a lottery within the meaning of §§ 1302 and 1304. Nonetheless, judicial approval of these programs provides persuasive authority for the position that, absent an indication to the contrary, selection by lot of government grantees or licensees should not be considered a lottery within the scope of those sections.

Congressional attention has focused generally on the oil and gas simultaneous leasing program at various times since its inception in 1960.[21] Although the SOG program has been labeled by some Members of Congress as a "lottery" or "gamble,"[22] it does not appear that attention has focused specifically on the issue of the legality of the lottery. Despite repeated congressional review of the program, however, the structure of the system remains unchanged. Although legislative inaction alone generally is insufficient evidence of congressional ratification, tacit acceptance of an administrative interpretation is a factor that must be considered when there is evidence that the administrative interpretation has been called to the attention of Congress. *See Blau* v. *Lehman,* 368 U.S. 403, 412–13 (1962); *United States* v. *Midwest Oil Co.,* 236 U.S. 459, 481; Sutherland, Statutory Construction § 49.10 (1973 and Supp. 1978).

In sum, we conclude that §§ 1302 and 1304 should not be construed to prohibit operation of the program. We again caution, however, that the issue is a close one and that persuasive arguments can reasonably be made on the other side. We note that the SOG program, as it now is administered, is not required by the enabling statute and that it may indirectly engender the type of activity at which the anti-lottery laws were aimed. Under these circumstances, you may wish to consider requesting specific congressional authorization for the program.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[21] *See, e.g., Bureau of Land Management Quadriennial Authorizations For Fiscal Years 1979–82: Hearings on S. 2234 Before the Senate Comm. on Energy and Natural Resources,* 95th Cong., 2d Sess. 150–52 (1978); *Bureau of Land Management Budget Request: Hearings Before the Interior Subcomm. of the House Appropriations Comm.,* 95th Cong., 2d Sess. 533–40 (1978); *Mineral Development on Federal Lands: Hearings on S. 1040 Before the Subcomm. on Minerals, Material, and Fuels of the Senate Comm. on Interior and Insular Affairs,* 93d Cong., 2d Sess. 2 (1974); *Federal Leasing and Disposal Policies: Hearings on S.R. 45 Before the Senate Comm. on Interior and Insular Affairs,* 92d Cong., 2d Sess. 23, 86 (1972); *Establishment of a National Mining and Minerals Policy: Hearings on S. 719 Before the Subcomm. on Mines and Mining of the House Comm. on Interior and Insular Affairs,* 91st Cong., 2d Sess. 93 (1970); *Reinstatement of Oil and Gas Leases: Hearings on H.R. 7915 and H.R. 7940 Before the Subcomm. on Mines and Mining of the House Comm. on Interior and Insular Affairs,* 90th Cong., 1st Sess. 27 (1967).

[22] *See, e.g., Department of the Interior and Related Agencies Appropriations for 1979, Part 6, Hearings before the Subcomm. on Interior Appropriations of the House Comm. on Appropriations,* 95th Cong., 2d Sess. 533–40 (1978).